BENJAMIN F. VAN WINKLE, defendant below, plaintiff in error, *vs.* THE STATE OF DELAWARE, plaintiff below, defendant in error.

1. STATUTES—TITLE OF ACT—SHIPMENT OF LIQUORS.

The Hazel Law (27 *Del. Laws*, *c.* 139), entitled "An Act regulating the shipment or carrying of spirituous, vinous, or malt liquor into local option territory or the delivery of same in such territory," by *section* 1 prohibits common carriers from accepting such liquor for shipment into local option territory, by *section* 2 prohibits any person engaged in the manufacture or sale of such liquor from delivering it in local option territory, by *section* 5 excepts shipments to physicians and druggists in limited quantities, and by *section* 6 prohibits any person from bringing from any point within the state into local option territory more than one gallon of whisky in twenty-four hours. *Held*, that, while *sections* 1 and 2, standing alone, established prohibition, and not a regulation, yet the act, construed as a whole, was a regulation of shipments, and the subject of the act was properly expressed in its title, as required by *Const. Del. art.* 2, § 16.

2. CONSTITUTIONAL LAW—INTOXICATING LIQUORS—PRIVILEGES OF CITIZENS—SHIPMENT OF LIQUORS.

The provision of Hazel Law (27 *Del. Laws*, *c.* 139) § 6, that no person, in quantities greater than one gallon in twenty-four hours, shall bring intoxicating liquors into local option territory from any point within the state, bears a substantial relation to the sale of intoxicating liquor in prohibited territory, and therefore is a proper exercise of the police power of the state, and not an abridgment of the privileges of citizens, guaranteed by *Const. U. S. Amend.* 14.

3. CONSTITUTIONAL LAW—EQUAL PROTECTION OF THE LAWS—INTOXICAT-
ING LIQUORS.

The Hazel Law (27 *Del. Laws, c.* 139) provides by *section* 5 that it shall
not apply to the shipment or delivery to physicians or druggists of such liquors
in unbroken packages not exceeding five gallons at any one time, and by *sec-
tion* 6 prohibits any person from bringing into local option territory any liquor
greater than one gallon within twenty-four hours. *Const. Del. art.* 13, § 1,
provides for an election to determine whether the sale of liquors in certain
districts shall be licensed or prohibited, and that, after a vote against license,
no person shall thereafter manufacture or sell liquors except for medicinal
or sacramental purposes. The Prescription Act (26 *Del. Laws, c.* 147) requires
all prescriptions for intoxicating liquors for medicinal purposes to be written
by practicing physicians. *Held,* in view of the recognized necessity of liquor
as a drug, and therefore readily to be obtained by those authorized to pre-
scribe or sell it, that the discrimination in favor of physicians and druggists
was reasonable, and that the Hazel Law did not deny the equal protection
of the laws.

4. CONSTITUTIONAL LAW—"EQUAL PROTECTION OF THE LAWS"—CLASS
LEGISLATION.

The provision of the federal Constitution guaranteeing to all persons
the "equal protection of the laws," does not mean broadly that all persons,
however situated, shall have the same rights and be protected in doing the
same things, but means that all persons in like situations shall have an equal
protection of the law; the test in ascertaining whether equal protection of
the laws is denied to any person, or to any class of persons, is whether the
classification adopted is an arbitrary one, or is a reasonable one in view of
the purposes and objects of the act.

5. INTOXICATING LIQUORS—SALE OF LIQUORS—PHYSICIANS.

The Hazel Law (27 *Del. Laws, c.* 139), providing by *section* 5 that it shall
not apply to the shipment or delivery to physicians of liquors in unbroken
packages not exceeding five gallons at any one time, does not permit liquor
to be sold by physicians.

6. CONSTITUTIONAL LAW—"POLICE POWER".

The "police power" of the state is an attribute of sovereignty, and when
exercised within its scope is supreme, to the exclusion of the power of the
general government. It is the power of government inherent in every sover-
eignty—that is, the power to govern men and things—and, when exercised
by a state sovereignty, extends to such restraints and regulations as are
reasonable and proper to protect the lives and property of its citizens and to
promote the order and welfare of society.

7. COMMERCE—REGULATION—RIGHTS OF STATES.

The power to regulate commerce between states, delegated to the federal
government, makes its exercise of such power supreme, to the exclusion of
the powers of state governments.

8. COURTS—DECISIONS OF UNITED STATES SUPREME COURT—AUTHORITY
IN STATE COURTS—"SUPREME LAW".

The decisions of the Supreme Court of the United States, respecting the
powers delegated to the general government and those reserved to the state
governments, constitute the "supreme law", and are controlling on the state
courts.

9. CONSTITUTIONAL LAW—JUDICIAL DEPARTMENT—ENCROACHMENT ON LEGISLATIVE.

In the division of powers, it is the function of the legislative department to make the laws, and the function of the judicial department to enforce them; and the courts are no more responsible for what a law may contain, so long as it is a valid enactment, than is the Legislature responsible for the manner in which the courts may enforce the law. The responsibilities of the two departments are as separate as their functions.

10. STATUTES—CONSTRUCTION—NECESSITY.

When a statute is validly enacted, and its language is plain, and conveys a clear and definite meaning, the sole duty of the courts is to give to it the exact meaning conveyed by its language, adding nothing thereto and taking nothing therefrom. It is only when the meaning of a statute is in doubt ,that courts are required first to construe it, in order to know how to enforce it.

11. COMMERCE — REGULATION — INTOXICATING LIQUORS — WEBB-KENYON ACT—HAZEL LAW.

The Webb-Kenyon Act (Act March 1, 1913, c. 90, 37 *Stat.* 699), by its title purporting to divest liquor of its interstate character only "in certain cases", and prohibiting transportation of intoxicating liquors from one state into another, to be received, possessed, sold, or used in violation of any law of such state, does not divest liquor of its interstate character in all cases, but removes the protection of the commerce clause only when the liquor is to be used in violation of any law of the state: and hence the Hazel Law (27 *Del. Laws*, c. 139), enacted thereunder, prohibiting the shipment or delivery of liquor in a prohibition district of the state for any purpose, except to physicians and druggists, is invalid as to a shipment and delivery of liquor from another state into a prohibition district of this state for the receiver's personal consumption, a purpose recognized by the act itself to be lawful.

12. STATUTES—PARTIAL INVALIDITY—EFFECT.

The Hazel Law (27 *Del. Laws*, c. 139), regulating shipments of intoxicating liquors into local option territory of the state for any purpose, except to physicians and druggists, though invalid as to an interstate shipment intended for the receiver's personal consumption, recognized by the act itself to be lawful, is a valid enactment in so far as it regulates, limits, or prohibits the shipment of liquor from one part of the state into a prohibition district in another part of the state.

(*June* 16, 1914.)

CURTIS, Chancellor, and WOOLLEY and RICE, J. J., sitting.

*John Biggs, Richard S. Rodney, Herbert H. Ward, Daniel O. Hastings, Lawrence Maxwell* and *Joseph S. Graydon* (both of the Ohio bar) for plaintiff in error.

*Josiah O. Wolcott*, Attorney General, *Armon D. Chaytor, Jr., John B. Hutton* and *Frank M. Jones*, Deputy Attorneys General, for defendant in error.

Supreme Court, June Term, 1914.

WRIT OF ERROR (No. 1, January Term, 1914) to Court

of General Sessions of Kent County.    (No. 32, October Term, 1913 below).

Benjamin F. Van Winkle was convicted of bringing intoxicating liquor into local option territory (*ante*, 88 *Atl.* 807), and he brings error.    Reversed.

Indictment for violation of *Chapter* 139, *Volume* 27, *Laws of Delaware*, known as the "Hazel Law", and conviction under the law as announced upon an agreed state of facts.

On the first day of March, 1913, the Congress of the United States enacted a statute which has become generally known as the "Webb-Kenyon Act," the title and text of which are as follows:

"An act divesting intoxicating liquors of their interstate character in certain cases.
"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled:
"That the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one state, territory, or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, into any other state, territory, or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, or from any foreign country into any state, territory, or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person, interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such state, territory, or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, is hereby prohibited."
37 *Stat.* 699.

Following the enactment of this federal statute, the General Assembly of the State of Delaware enacted a statute now commonly known as the "Hazel law," approved April 8, 1913, which is in the following language:

"An act regulating the shipment or carrying of spirituous, vinous or malt liquor into local option territory, or the delivery of same in such territory.
"Be it enacted by the Senate and House of Representatives of the State of Delaware in General Assembly met:
"Section 1.    That it shall be unlawful for any common carrier, knowingly to accept or receive for shipment, transportation or delivery to any person or place within local option territory, or to carry, bring into, transfer to any

other person, carrier or agent, handle, deliver or distribute in local option territory, any spirituous, vinous or malt liquor, regardless of the name by which it may be called.

"Section 2. That it shall be unlawful for any person, firm or corporation engaged in the manufacture or sale of spirituous, vinous or malt liquor, or the agent, servant or employee of any such person, firm or corporation, to carry, convey or bring into local option territory, spirituous, vinous or malt liquor, regardless of the name by which it may be called, by any conveyance or means of transportation whatsoever.

"Section 3. That any person, whether as principal, or agent, clerk or servant of another, who shall knowingly violate any of the provisions of this act, shall upon conviction thereof be fined not less than fifty dollars, nor more than five hundred dollars for the first offense; and upon conviction for any subsequent offense, in addition to such fine shall be imprisoned for a period of not less than thirty days, nor more than six months.

"Section 4. This act shall apply to all packages of spirituous, vinous or malt liquor, whether broken or unbroken. Each package of spirituous, vinous, or malt liquor, regardless of the name by which it may be called, accepted, received, carried, transferred, handled, delivered or distributed in violation of the provisions of this act, shall constitute a separate offense. And the false or fictitious naming or labeling of any spirituous, vinous or malt liquor for shipment or delivery into local option territory, shall work a forfeiture of such liquor.

"Section 5. Nothing in this act shall be construed to apply to the shipment or delivery to physicians or druggists, of spirituous, vinous or malt liquor, in unbroken packages in quantity not to exceed five gallons at any one time, nor to the delivery to churches, or the proper officers thereof, of wine in unbroken packages for sacramental purposes.

"Section 6. That it shall be unlawful for any person to carry, bring or have brought any quantity of spirituous, vinous or malt liquor from any point within the State of Delaware into local option territory within said state greater than one gallon within the space of twenty-four hours."

*Chapter* 139, *Volume* 27, *Laws of Delaware.*

In the Court of General Sessions of the State of Delaware, in and for Sussex County, at its June term, 1913, the grand jury indicted one William Grier for a violation of certain of the provisions of the last recited act, charging that as the agent of a liquor dealer in the City of Philadelphia and State of Pennsylvania, William Grier brought into local option territory, within the State of Delaware, to wit, in Sussex County, a certain quantity of liquor purchased by a resident of the said county and there delivered the same to him. The case was heard and the law decided by the court upon an agreed state of facts and the defendant was convicted under the law as stated in the opinion of the court and reported under the title of *State v. Grier, ante,* 88 *Atl.* 579.

In the Court of General Sessions of the State of Delaware,

in and for Kent County, at its October term, 1913, the grand jury found a true bill against one Benjamin F. Van Winkle, who is the plaintiff in error in this case, charging that in violation of the said Hazel Law, he, as agent of the Adams Express Company, a common carrier doing business in the State of Delaware, transported and delivered liquor to a resident of Kent County, which is a local option district in the State of Delaware.

The case was presented to the Court of General Sessions, upon the following agreed state of facts:

"And now, to wit, this tenth day of November, A. D. 1913, it is agree by and between Josiah O. Wolcott, Attorney General of the State of Delaware, and Daniel O. Hastings, Herbert H. Ward and John Biggs, attorneys for Benjamin F. Van Winkle, the defendant in the above stated case, that the following case be stated for the opinion of the court.

"That Benjamin F. Van Winkle was on the ninth day of August, A. D. 1913, and for a long time prior thereto the agent of the Adams Express Company at the Town of Smyrna, located in Duck Creek Hundred, Kent County, State of Delaware; that the said Adams Express Company was on the said ninth day of August and for a long time prior thereto a common carrier of goods, wares and merchandise, and now is and then was authorized to do business as a common carrier in all parts of the State of Delaware, and in other states, including the State of Pennsylvania; that it was within the scope of the employment of the said Benjamin F. Van Winkle, as agent as aforesaid, to deliver as agent aforesaid, goods, wares and merchandise transported and carried by said Adams Express Company and consigned to persons in the Town of Smyrna, aforesaid; that on the ninth day of August, A. D. 1913, Consumers Brewing Company, a corporation doing business in the City of Philadelphia, State of Pennsylvania, pursuant to the direction of one Henry M. Smith, delivered to said Adams Express Company, a common carrier as aforesaid, in the said City of Philadelphia, one crate of malt liquor, to wit, beer in bottles, consigned to and to be transported, carried and delivered to said Henry M. Smith of the Town of Smyrna, in Duck Creek Hundred, State of Delaware; that the said malt liquor was known to be such and was so received by said Adams Express Company and promptly transported and carried by it as common carrier aforesaid by means of a continuous and unbroken transportation from the said City of Philadelphia in the State of Pennsylvania through New Castle County in the State of Delaware to the Town of Smyrna in Kent County, State of Delaware, where it was received by the said Benjamin F. Van Winkle in the course of his employment as agent as aforesaid, for delivery to the said Henry M. Smith, and was delivered by the said Benjamin F. Van Winkle in the course of his employment as agent as aforesaid, to the said Henry M. Smith; that at the time the said malt liquor was so delivered by the said Benjamin F. Van Winkle, the said Benjamin F. Van Winkle knew that it was malt liquor, to wit, beer, that he was delivering in manner aforesaid; that the said malt liquor was intended by the said Henry M. Smith to be used by him for his own consumption, and he did not intend to sell or otherwise unlawfully dispose of the same; that the purpose for which the said liquor was to be used was known to the said Adams Express Company, and to its agent the said Benjamin F. Van Winkle; that the said

malt liquor had been theretofore purchased by the said Henry M. Smith from the said Consumers Brewing Company by sending a written order therefor from the Town of Smyrna aforesaid, to the said Consumers Brewing Company at the City of Philadelphia aforesaid, together with the purchase price therefor through the mail, directing that the said beer be shipped to him, the said Henry M. Smith, by the said Adams Express Company; that the said Consumers Brewing Company was authorized under the laws of the State of Pennsylvania to sell the said malt liquor; that the said Adams Express Company intended at the time the said malt liquor was so received by it to transport, carry and have the same delivered by its agent in the manner aforesaid, and the said Benjamin F. Van Winkle intended when the said malt liquor was so received by him to deliver the same as aforesaid as agent as aforesaid; that the said Henry M. Smith was not then and there a physician or druggist or a proper official of a church receiving said liquor for sacramental purposes; that the said Kent County was then and there a district where under the provisions of *Article* 13 of the *Constitution* of the State of Delaware known as the 'Local Option Article', the majority of the qualified voters had voted against the license and in favor of the prohibition of the manufacture and sale of spirituous, vinous, and malt liquors, except for medicinal and sacramental purposes.

"If the court shall be of the opinion upon the facts aforesaid that, under the laws of the State of Delaware and of the United States of America, a crime punishable under the laws of the State of Delaware is stated or shown to have been committed, then judgment shall be entered against said defendant upon the verdict of the jury charged accordingly by the court, upon the said admitted facts; and if the court shall be of the opinion, upon the facts aforesaid, that under the laws of the State of Delaware and of the United States of America a crime punishable under the laws of the State of Delaware is not stated or shown to have been committed then judgment shall be entered accordingly upon a verdict of 'not guilty'. The said defendant, in case of a judgment against him as aforesaid, reserves the right to except to the charge of the court upon the law."

The defendant, through his counsel, prayed the court to find the law and to charge the jury in accordance with the prayers they submitted, the substance of which will appear later in this statement. The state asked that the prayers of the defendant be refused and that on authority of the case of *State v. Grier* the jury be instructed to return a verdict of guilty.

The charge of the court was in accordance with the prayer of the state, and is as follows:

"Gentlemen of the jury:—The court decline to instruct the jury to return a verdict of not guilty. The court think this case is controlled by *State v. Grier* (recently decided in Sussex County) *ante*, 88 *Atl.* 579, inasmuch as all questions raised in the present case were raised and determined in the *Grier case*. For the reasons given in the opinion delivered in the *Grier case*, which are applicable to the questions now raised, we hold that the statute of this state, known as the 'Hazel Law' is constitutional, and that the federal act known as the 'Webb-Kenyon Law' is also constitutional, and applicable to the present case, if the facts raise the same questions of law as to its applicabi l_

Statement.

ity, as contended by the defendant, as would be raised if the indictment were against the express company of which the defendant was agent; which is the contention made by the defendant.

"The court are therefore of the opinion, upon the agreed statement of facts, that under the laws of the State of Delaware, and of the United States of America, a crime punishable under the laws of the State of Delaware is stated or shown to have been committed by the defendant. Being of such opinion the jury is charged and directed to return a verdict of guilty against the defendant; and it is ordered that judgment be entered against the defendant upon such verdict in conformity with the terms and stipulations of the case stated."

The defendant excepted to the charge of the court and the jury rendered a verdict of guilty, whereupon the defendant sued out of the court the writ of error upon which this case has been heard.

The assignments of error, when classified, present the following propositions of law:

"1.   That the act of the Legislature under which the defendant is indicted, being *Chapter* 139, *Volume* 27, *Laws of Delaware*, is unconstitutional in that it violates *Section* 16, *Article* 2, of the State Constitution, which provides that the subject of every bill shall be expressed in its title.

"2.   That the said act, being *Chapter* 139, *Volume* 27, *Laws of Delaware*, is unconstitutional in that *Section* 5 thereof violates the fourteenth amendment of the federal Constitution, which provides that no state shall * * * deny to any person within its jurisdiction equal protection of the laws.

"3.   That the said act is unconstitutional in that a portion of it abridges the privileges of citizens, which are guaranteed by the fourteenth amendment of the federal Constitution.

"4.   That beer, being an intoxicating liquor, is an article of commerce, and in this case is a lawful article of interstate commerce, and as such cannot be subject to state law as to its transportation, and delivery as a part of such transportation, in Kent County.

"5.   That the federal law of March 1, 1913, known as the 'Webb-Kenyon Law', entitled 'An act divesting intoxicating liquors of their interstate character in certain cases,' does not deprive the shipment in question of the protection of the Interstate Commerce Law, in that the shipment in question was intended to be used for a lawful purpose.

"6.   That if the said federal statute, known as the 'Webb-Kenyon Law,' is applicable by its terms to the case charged in the indictment in this case, yet that the said federal statute is unconstitutional.

"7.   That the act of Congress of March 1, 1913, known as the 'Webb-Kenyon Law,' has no bearing on this case; that the indictment in this case was not based on that law and could not be, because a state court cannot punish the violation of a federal statute.

"8.   That the shipment of beer referred to in the indictment in this cause was an interstate shipment from the State of Pennsylvania into the County of Kent in the State of Delaware, said county being local option or dry territory in the last mentioned state; that the indictment should, there-

fore, have charged that the beer, being intoxicating liquor, in question was intended to be possessed, sold, or in some manner used by the consignee in the violation of the laws of the State of Delaware."

WOOLLEY, J., after making the foregoing statement of the case, delivered the opinion of the court.

[1]  Upon the first proposition suggested by the assignments of error, "That the act of the Legislature under which the defendant is indicted, being *Chapter* 139, *Volume* 27, *Laws of Delaware*, is unconstitutional in that it violates *Section* 16, *Article* 2, of the state *Constitution*, which provides that the subject of every bill shall be expressed in its title," we hold that the act in question is not unconstitutional for the reason urged, and in doing so we adopt the reasoning and approve the decision of the Court of General Sessions in the case of *State v. Grier*, in disposing of the same question.

[2]  The third proposition, "That said act is unconstitutional in that a portion of it abridges the privileges of citizens which are guaranteed by the fourteenth amendment of the federal Constitution," relates specially to *section* 6 of the act, which reads:

"That it shall be unlawful for any person to carry, bring, or have brought, any quantity of spirituous, vinous or malt liquor from any point within the State of Delaware into local option territory within said state greater than one gallon within the space of twenty-four hours."

We hold that the act does not amount to an abridgment of those privileges guaranteed to citizens by the fourteenth amendment of the federal Constitution, for the reasons given in that part of the opinion of the Court of General Sessions, in *State v. Grier, ante*, 88 *Atl.* 579, in disposing of the same subject.

Propositions of law numbered 7 and 8 were not seriously urged at the argument and are therefore decided against the contention of the plaintiff in error without an opinion.

[3-5]  The second proposition, "That the said act, being *Chapter* 139, *Volume* 27, *Laws of Delaware*, is unconstitutional in that" it "violates the fourteenth amendment of the federal Constitution, which provides that no state shall  *  *  *  deny to any person within its jurisdiction equal protection of the laws,"

is directed to the classifications and the discrimination in the classifications made by *sections* 5 and 6 of the act.

*Section* 5 provides that:

"Nothing in this act shall be construed to apply to the shipment or delivery to physicians or druggists, of spirituous, vinous or malt liquor, in unbroken packages in quantity not to exceed five gallons at any one time, nor to the delivery to churches, or the proper officers thereof, of wine in unbroken packages for sacramental purposes."

*Section* 6 provides:

"That it shall be unlawful for any person to carry, bring or have brought any quantity of spirituous, vinous or malt liquor from any point within the State of Delaware into local option territory within said state greater than one gallon within the space of twenty-four hours."

The contention of the plaintiff in error is that these two provisions of the statute constitute class legislation, favoring some and discriminating against others, in that the shipment of liquor to physicians in five gallon quantities is allowed while the shipment of liquor to others in any quantity is prohibited; that the exception in favor of physicians is not made to enable them to have liquor for medicinal purposes, for the reason that physicians cannot sell liquor, and as physicians are thus allowed to have liquor shipped to them for their own personal use to the extent of five gallons at a time, while other people may not have any liquor shipped to them at all, the classification is unreasonable and arbitrary. Pretty much the same argument is made as to druggists, excepting with respect to them the law provides a method of sale. We understand that no contention is made that the classification with respect to the right of shipment of liquor to churches or to their proper officers for sacramental purposes is a classification violative of the amendment to the federal Constitution.

The provision of the federal Constitution guaranteeing to all persons the equal protection of the laws, does not mean broadly that all persons howsoever situated shall have the same rights and be protected in doing the same things, but it means that all persons in like situations shall in those situations have an equal protection of the law. To this end governments may legislate

with respect to people in their different relations one to another and to the things that are the subjects of government. If such legislation amounts to class legislation as it is generally termed— that is, legislation that discriminates against some and favors others—it is prohibited by the amendment; but legislation, which in carrying out a public purpose is limited in its application, and within the sphere of its operation, affects alike all persons similarly situated, is not within the amendment. The test to be applied in ascertaining whether equal protection of the laws is denied to any person or to any class of persons, as stated by the court in the case of *State v. Wickenhoefer*, 6 *Penn.* 120, 64 *Atl.* 273, "is whether or not the classification adopted by the Legislature is an arbitrary one or whether it is a reasonable classification in view of the purposes and objects of the act," resting upon some difference which bears a reasonable and just relation to the thing in respect to which the classification is made.

In order to determine whether the classifications made by *sections* 5 and 6 of the act are reasonable or unreasonable, just or arbitrary, and therefore constitutional or unconstitutional, we must consider the law as it existed and the conditions that prevailed at the time the statute was enacted, and the purposes and objects sought to be attained thereby.

It has long been the policy of this state to restrict the right to sell liquor to those licensed to sell it. It was enacted by the statute of March 22, 1867:

"That no person * * * *without having first obtained a proper license therefor*, * * * shall, within the limits of this state, be engaged in * * * any business * * * in this section hereafter next mentioned, that is to say, * * * selling vinous, spirituous or malt liquors." *Chapter* 117, *Volume* 13, *Laws of Delaware.*

This statute, in so far as it related to the business of selling liquor, was repealed and its general provision superseded by the more specific provisions of the act of April 10, 1873 (*Chapter* 418, *Volume* 14, *Laws of Delaware; Rev. Code, p.* 410), and the acts amendatory thereto, by the first section of which a sweeping declaration is made as to who shall *not* sell liquor in the State of Delaware. The act says:

"No person, by himself, his agent, or servant, directly or indirectly, shall sell any intoxicating liquors except as herein provided."

Following these words of general exclusion, the statute provides for the sale of liquor in any and in all cases under a system of licenses, which have a relation to the quantity to be sold and the place upon which the liquor is to be drunk, and designates and classifies the persons to whom licenses for the sale of liquor in different ways, may be granted. In these classifications, physicians are neither included nor in any way mentioned, but druggists are mentioned and included.

By this statute, druggists were allowed to procure licenses for the sale of liquor limited to certain quantities but apparently not limited to medicinal purposes. *Chapter* 418, *Volume* 14, *Laws of Delaware; Chapter* 384, *Volume* 16, *Laws of Delaware; Chapter* 125, *Volume* 25, *Laws of Delaware.*

Under the act of April 24, 1889 (*Chapter* 555, *Volume* 18, *Laws of Delaware*), the right of sale of liquor by druggists was further restricted by a provision that:

"It shall  *  *  *  be unlawful for any druggist licensed to sell intoxicating liquors, to sell the same otherwise than upon the written order or prescription of a regular practicing physician, which order or prescription shall state that such liquor is necessary for medicinal purposes."

Under this statute a druggist had a right to sell liquor only when licensed, and then only upon prescription and for one defined purpose.

Thus stood the law with respect to the sale of liquor for medicinal purposes, at the time of the adoption of the Constitution of 1897.

The *Constitution of* 1897 (*Section* 1, *art.* 13) provides for the submission to the qualified voters of certain districts in the State of Delaware the question whether the manufacture and sale of liquors therein shall be licensed or prohibited, and directs that when upon such submission a majority is against license:

"No person, firm or corporation shall thereafter manufacture or sell spirituous, vinous or malt liquors, *except for medicinal or sacramental purposes*, within said district."

The question contemplated by the provision of the Constitution quoted was submitted to the voters of Kent and Sussex Counties in 1907, by authority of *Chapter* 65, *Volume* 24, *Laws of Delaware*, resulting in a majority against license and establishing Kent and Sussex Counties as districts in which the manufacture and sale of liquor is forbidden, except for the purposes designated.

In harmony with the exception in the Constitution and the act of submission respecting the sale of liquors for medicinal and sacramental purposes in prohibition territories, the General Assembly of 1911, by *Chapter* 147, *Volume* 26, *Laws of Delaware*, passed an act entitled "An act regulating the sale of intoxicating liquors for medicinal purposes" (applicable only to Kent and Sussex Counties), which provides:

"Section 1. That from and after the approval of this act all prescriptions for intoxicating liquors for medicinal purposes shall be written by regular practicing physicians in blank prescription books. * * * Such prescriptions shall set forth the kind and quantity of liquors prescribed, the name of the person for whom prescribed, the date on which the prescription is written and the directions for use, and shall be signed by the full name of the physician issuing the same, and no physician shall write any prescription for intoxicating liquors except the person for whom it is issued is actually sick and such liquor is required as a medicine for such illness. * * *

"Section 3. Every druggist in this state *who holds a license* for the sale of intoxicating liquors shall keep in good faith in a book which he shall provide for the purpose, an exact and true record of all prescriptions filled by him," etc.                              ·

This act is known as the "Prescription Act" and repeals only those acts and parts of acts inconsistent with it and supplements those acts not inconsistent with it, the manifest purpose of the act being to provide a method of sale of intoxicating liquor for medicinal purposes in prohibition districts, to meet the exception made by the Constitution.

Such is the history of the legislation upon the subject until the enactment of the Hazel Law in 1913.

It is admitted that the provision of the Hazel Law allowing the shipment and delivery of wine to church officers "for sacramental purposes" is in harmony with the exception of the Constitution, and as the *purpose* for which the wine is to be used is expressed in the permissive words of the statute, it is a lawful classification and does not amount to a discrimination against

the equal rights of other citizens. It is maintained, however, that as physicians and druggists are given the right to have shipped to them in prohibition districts five gallons of liquor at a time for no specified purpose, and therefore *for any purpose*, and as from other individuals within those districts is withheld the right to have shipped to them any liquor for any purpose, though they may carry therein one gallon a day *for their own use*, the statute makes a discrimination in favor of physicians and druggists that amounts to a denial of equal rights guaranteed to others by the federal Constitution.

It must be conceded that in permitting druggists and physicians to receive liquor by shipment in such large quantities, when other individuals not in their occupations are forbidden to have liquor shipped to them in any quantity, the Legislature had some reason for making the classification and establishing the difference. If the exception had been in favor of shoemakers and sailors, no reason could have been discovered for the discrimination, but when the discrimination is in favor of two classes, which of all classes are recognized by common acceptance, and specifically by law as well, to have a special and professional use for the particular commodity, the discrimination is understood. The fact that the purpose for which imported liquor may be used by persons in these professional classes is not designated by the statute, detracts nothing from the necessary inference that liquor may be shipped to them, by permission of the statute, because of the recognized necessity of liquor as a drug to be used and administered and therefore readily to be obtained by those who under the law are authorized either to administer or sell it. In making the exception of physicians and druggists, the statute undoubtedly makes a discrimination in their favor. Such a discrimination is permitted or prohibited and therefore lawful or unlawful only as the discrimination is reasonable or arbitrary. We think the discrimination may even amount to a privilege, yet the privilege is based upon the peculiar professional character of those to whom it is extended, the especial purposes for which they are permitted by the Constitution to use the liquor, and as a public recognition of their occupations in relation to the sick and as

bearing upon the health of the community. These may have been the reasons why the words "for medicinal purposes" were omitted from the statute, and if so, they are good reasons, and do not render the discrimination unjust.

When Kent and Sussex Counties decided against license, only so much of the old license law was repealed by that decision as was inconsistent with the new situation, leaving portions of the old law existing. The law as it existed, after the submission, and as it now exists, so far as it relates to the right of druggists to sell liquor, is positive. No druggist shall sell liquor in Kent or Sussex County except he be licensed as required by law; no druggist so licensed, shall sell liquor except for medicinal purposes; and no druggist shall sell liquor even for medicinal purposes, except in the quantities and by prescription of physicians, likewise required by law.

With this much law relating to the sale of intoxicating liquor by druggists surviving on the statute books and alive, the Legislature in discriminating in the Hazel Law in favor of druggists must have only intended to recognize a class dealing in liquor for medicinal purposes, and by providing a means by which that class could get a supply of liquor, endeavored to carry out the meaning of the Constitution which expressly allowed the manufacture and sale of liquor for *medicinal* purposes in prohibition territory.

There is not now nor has there ever been a statute of the State of Delaware which confers upon physicians a right to sell liquor, and the early law, which denies the right to all persons not licensed, excluded physicians and excludes them yet, unless, indeed, the contention of the state in this case be maintained.

The state contends that the discrimination of the fifth section of the Hazel Law in favor of physicians is a reasonable one, upon the ground that the Constitution preserves the right of the sale of liquor for medicinal purposes in territory where the sale of liquor for other purposes is prohibited, and that as the Legislature has by no statute (other than the Prescription Act) enacted legislation for the regulation of the sale of liquor for medicinal purposes in prohibition territory, the sale of liquor for medicinal

purposes must be made and should be made only by those who deal in liquors for those purposes, and, of those, physicians form one class. And of this opinion was the court below.

With the contention of the state and ruling of the court below, that liquor may be *sold* by physicians, we do not concur. In the first place, the Hazel Law is not a law regulating the *sale* of liquor. It is a law regulating the shipment and delivery of liquor. This law neither confers upon nor withholds from any one the right to sell liquor in prohibition territory, and in this respect it makes no exception of physicians or druggists. A physician not having a right to sell liquor in Kent County before the enactment of the Hazel Law, has no right to sell the liquor in that county after the enactment of that law.

There is a law against the sale of liquor in a prohibition territory (*Chapter* 65, *Volume* 24, *Laws of Delaware*) and this law makes it "unlawful for any person * * * to sell * * * liquors, except for medicinal or sacramental purposes, within said districts." There is nothing in this law or in any law of the State of Delaware that by expression confers upon physicians the right to sell liquor either with or without a license, for any purpose. Now, is it necessary to hold, by implication of the Constitution preserving the right of the sale of liquor for medicinal purposes, that physicians because of the importance of the commodity to their profession, have the right to *sell* it? We think not, for we believe the existing law with respect to a legal method of selling liquor by druggists for medicinal purposes, satisfies the exception of the Constitution, whether it satisfies a popular demand for liquor or not.

Although physicians are not authorized by the expression or the implication of any law of this state, to sell liquor in any place, in any quantity, for any purpose, they are not prohibited from using it for medicinal purposes. In general opinion, it is considered an important and by the framers of the Constitution it was thought to be a necessary thing to be used in the practice of medicine. Against its use as a medicine, there is no law, in fact its use as a medicine is recognized and protected by law, and a physician may use and administer it in his practice, just

as he may use and administer cocaine or any habit-forming drug. The provision of the Hazel Law permitting shipment of liquor to physicians, as an excepted class, is but a recognition by the Legislature of this use of liquor, and of the exemption by the Constitution respecting the sale of it for this use, and therefore constitutes not an unreasonable, but to our minds a perfectly reasonable, discrimination, and other people not similarly situated cannot complain that the same privilege is withheld from them.

We are of opinion that, upon the contention made, the act does not violate the fourteenth amendment of the federal Constitution, and is not therefore unconstitutional.

Propositions 4, 5 and 6 are as follows:

"That beer, being an intoxicating liquor, is an article of commerce, and in this case is a lawful article of interstate commerce, and as such cannot be subject to state law as to its transportation, and delivery as a part of such transportation, in Kent County.

"That the federal law of March 1, 1913, known as the 'Webb-Kenyon Law,' entitled, 'An act divesting intoxicating liquors of their interstate character in certain cases,' does not deprive the shipment in question of the protection of the Interstate Commerce Law, in that the shipment in question was intended to be used for a lawful purpose.

"That if the said federal statute, known as the 'Webb-Kenyon Law', is applicable by its terms to the case charged in the indictment in this case, yet that the said federal statute is unconstitutional."

These propositions are nearly related in principle and present in different phases the same questions of law, and will therefore be considered together. They involve questions of the validity of a state law regulating or attempting to regulate and restrict commerce between the states in a specified commodity, and the validity of a federal law delegating, permitting or acquiescing in the exercise of such a power by a state, in view of the provision of the federal Constitution conferring upon the Congress of the United States supreme power to regulate commerce between the states, and thus present in new forms old questions which have been the bases of legislative and judicial conflicts between the state and federal governments almost since their foundation.

In our scheme of government, which contemplates the delegation of certain and defined powers to national control and the

reservation of equally certain powers to state or local control, there is with respect to the existence and location of those powers no conflict between state and federal sovereignties. But in a complicated system such as ours, wherein exist two governments over the same people, in which in different ways the laws first of one and then the other are supreme, according to the authority under which they are enacted and with reference to the subjects to which they are addressed, conflicts in the exercise of those powers are inevitable.

[6] Among the powers reserved to each of the separate governments, which together form the general government of the United States, is what is termed the "police power" of the state. This power is an attribute of sovereignty, and when exercised within its scope is supreme, to the exclusion of the power of the general government. Police power "is the power of government inherent in every sovereignty, that is to say, the power to govern men and things" (*License Cases*, 5 *How*. 504, 583, 12 *L. Ed*. 256), and when exercised by a state sovereignty extends to such restraints and regulations as are reasonable and proper to protect the lives, health, comfort and property of its citizens and to promote the order, morals, safety and welfare of society.

[7] On the other hand, among the powers delegated to the federal government is the power to regulate commerce between the states, and in the exercise of that power the authority of the federal government is supreme to the exclusion of the powers of state governments.

When between these extremes of sovereignty there comes a thing, which from its nature as property is a subject of ownership, traffic and interstate commerce and over it the federal government assumes supreme control, and which because of its nature is a menace to the health, morals and safety of society, and over it the state likewise attempts supreme control, there occurs a collision of powers, and from that collision one only can emerge supreme.

[8] In such a conflict it devolves upon the courts to determine which sovereignty has been invaded and which power is supreme. To arrive at such a determination it is necessary for

the courts to revert to the early laws, examine and ascertain the powers originally partitioned between the governments of the states and the United States, and seek the foundation of the laws out of which such a controversy has arisen, by progressively following the legislative and judicial history of the matter down to the point of conflict. This is not merely a wise policy but it is a necessary one, as the only guides to a decision of a case like this, are those afforded first by the language of the Constitution, and then the legal meaning of that language, and the legal effect of the statutes enacted thereunder, as determined and illuminated by the judicial pronouncements upon the subject by the judicial tribunal having authority finally to decide the law. A decision by the court in this case that involves anything beyond this would be a decision without authority, for by the decisions of the Supreme Court of the United States, respecting the powers delegated to the general government and those reserved to the state governments, are we not only guided but controlled, and until those decisions are modified or altered, or the language of the Constitution itself is changed, they constitute the supreme law, and we are bound by them.

The conflict between the state and federal governments for control and regulation of the sale and transportation of liquor has been waged since early times, and revolves around what is known as the commerce clause of the federal Constitution (*article* 1, § 8), and the meaning and legal effect of that clause as a supreme federal power, taken in connection with or in opposition to the police powers of the states, which, when existing and defined, are in turn supreme in the states.

The Constitution declares that the Congress has power "to regulate commerce with foreign nations, among the several states, and with the Indian tribes." These words give all the authority which the United States has over commerce. The police powers of the states are not conferred by statute, but are powers reserved to the states, for the regulation of their internal affairs, and are rather elastic in their scope and definition.

The power to regulate commerce among the several states is granted to the Congress in the same clause and by the same

words as the power to regulate commerce with foreign nations, and is co-extensive with it. The first judicial pronouncement by the Supreme Court of the United States upon the commerce clause of the Constitution, which has a bearing upon the matter now before us, was in the celebrated case of *Brown v. State of Maryland*, 12 *Wheat.* 419, 6 *L. Ed.* 678, and related to the right of the State of Maryland to levy a tax upon a commodity (not liquor) imported into that state from a foreign country. The question of the right of a state to enact a law that either in purpose or effect, directly or indirectly, regulates or restricts commerce with a foreign country was fully presented to the Supreme Court for the first time by that case. The court held that an article authorized by a law of Congress to be imported continued to be a part of the foreign commerce of the country while it remained in the hands of the importer for sale in the original bale, package, or vessel in which it was imported; that the authority given to import necessarily carried with it the right to sell the imported article in the form and shape in which it was imported, and that no state, either by direct assessment or by requiring a license from the importer before he was permitted to sell, could impose any burden upon him or the property imported beyond what the law of Congress had itself imposed; but that when the original package was broken up for use or for retail by the importer, and also when the commodity had passed from his hands into the hands of a purchaser, it ceased to be an import, or a part of foreign commerce, and became subject to the laws of the state, and might be taxed for state purposes, and the sale regulated by the state, like any other property. This was substantially the decision in the case of *Brown v. State of Maryland*, drawing the line between foreign commerce, which is subject to the regulation by the Congress to the exclusion of the states, and internal or domestic commerce within each state, the regulation of which belongs to the state, to the exclusion of the Congress.

The case of *Brown v. State of Maryland* forms the basis of the subsequent decisions of the Supreme Court upon the matter of federal regulation of commerce between the states with respect to the commodity of liquor. The first important cases before the

Supreme Court of the United States, which bore directly upon the subject, were several cases thereafter known by the general name of the *License Cases*, 5 *How*. 504-633, 12 *L. Ed*. 256, heard and decided in 1847. In these cases the abstract question of law was: Is a state law, prohibiting the resale of imported spirits, except by license, on the ground that, for moral, medical, economical, or other reasons, the public good will not be promoted by such sale, repugnant to the acts of Congress, and to treaties authorizing the importation of such spirits?

On the part of those attacking the right of a state to regulate the resale of liquor authorized by the laws of Congress to be imported into the state, and thereby ultimately to prohibit the resale thereof, it was contended that a congressional act authorizing importation of spirits is a legislative determination that the foreign article may properly, and shall, enter into consumption of the state, and be sold in the interior market thereof; and that a state statute, limiting or restricting the resale, amounts to an interception in the hands of the first buyer, shuts the importer from the country as really as if he were prohibited to import, and therefore contravenes the determination of the federal legislation, upon a directly opposite policy.

On the other hand, the state contended that the requirement that a purchaser of imported spirits be licensed under a state law, before resale, is a regulation of the internal commerce of the state, having for its object the preservation of order, morals and health and intended to discourage intemperance and to promote sobriety, and therefore falls within the class of laws, enacted under the powers reserved to the state, and generally called "police regulations".

The court held that a state could not by statute prohibit the importation of foreign spirits, as such a law would be repugnant to the commercial power of the federal government, but the matter of the resale by the consignee of imported spirits in the original package, was one over which the Congress and the states had concurrent jurisdiction, to the extent that in the *absence* of regulation by act of Congress, under the power conferred by the commerce clause of the Constitution, a state within its police power

might regulate and thereby prohibit the sale of spirits in the original package in which they were imported, or in the presence · of some regulating act of Congress, a state might in turn regulate such a sale under a state law, if such state law was not inconsistent with or repugnant to the act of Congress.

The law as decided by the *License Cases* in 1847 was little disturbed by judicial decisions until the decade of 1880-1890, in which period the case of *Mugler v. Kansas*, 123 *U. S.* 623, 8 *Sup. Ct.* 273, 31 *L. Ed.* 205, was heard. In that case the Supreme Court held valid a statute of the State of Kansas, which prohibited the *manufacture and sale* of intoxicating liquors within the limits of that state, except for medical, scientific or mechanical purposes, but expressly avoided an opinion upon the power of a state to prohibit the sale of imported liquor within its limits, when such liquor was authorized by Congress to be imported, intimating, against the decision in the *License Cases*, that when the liquor is authorized to be imported from one state to another, the right of sale of the liquor would seem to follow the right to import it. The decision in this case has a relation to the matter under discussion only because it was an early expression of doubt by the Supreme Court of the right of a state to regulate or prohibit the resale of liquor after the importation, as decided in the *License Cases*.

The point in the judgment of the *License Cases* was strictly confined to the right of the states to regulate or prohibit the *sale* of intoxicating liquor by the consignee after it had been brought within state limits. The right to transport liquor into the states was not questioned in those cases. Indeed, the reasoning which justified the right of a state to prohibit sales of imported liquor, admitted by implication, the right to transport liquor from one state into another as a commodity of lawful commerce, free from the control of the several states and subject to the exclusive power of Congress over commerce.

The case of *Bowman v. Chicago, etc., Railway Co.*, 125 *U. S.* 465, 8 *Sup. Ct.* 689, 1062, 31 *L. Ed.* 700, decided in 1888, represents the next important step in the progress of judicial interpretations of state and federal powers over commerce that is inter-

state in character. This case involved the validity of a law of the State of Iowa, which prohibited the *importation* of liquor into Iowa from another state by common carriers, excepting under certain circumstances.

With respect to the right of a state to act upon matters of commerce in the absence of action by the federal Congress, the decision in this case did not go quite to the extent of the decision in the *License Cases*, but held that the right of a state to regulate commerce by a state law, in the absence of a law of Congress upon the same subject, is a right to be determined from the circumstances of each case as it arises; deciding that the statute of Iowa forbidding common carriers to transport intoxicating liquors into that state from another state, excepting under certain conditions, although adopted without a purpose of affecting interstate commerce, and while intended as a part of a general system designed to protect the health and morals of the people against the evils resulting from the unrestricted manufacture and sale of intoxicating liquors within the state, was neither an inspection law, nor a quarantine law, nor a law confined to the regulation of purely internal and domestic commerce of the state, over which a state may properly exercise control, but was essentially a regulation of commerce among the states, affecting interstate commerce in an essential and vital part, and not being sanctioned by the authority of Congress, either expressed or implied, was repugnant to the Constitution of the United States; and concluding with a *quaere* as to the main point decided in the *License Cases* and questioned in *Mugler v. Kansas*, namely, whether the right of transportation of an article of commerce from one state to another includes by necessary implication the right of the consignee to sell it in the unbroken package at the place where the transportation ends.

The question adverted to and not decided in the opinions of the Supreme Court in *Mugler v. Kansas* and *Bowman v. Chicago, etc., Railway Co., supra*, whether a state may withhold, from a consignee of imported liquor, the right to sell the same in the original package, as an essential and constituent part of commerce in that article, was presented to the Supreme Court for

decision in the case of *Leisy v. Hardin*, 135 *U. S.* 100, 10 *Sup. Ct.* 681, 34 *L. Ed.* 128, decided April 28, 1890.

The court cited numerous decisions made by it in recognition of the undoubted right of the states to control their purely internal affairs, under the exercise of powers not surrendered to the national government; but held that wherever the law of a state amounts essentially to a regulation of commerce among the states, by prohibiting commerce with other states in an article recognized by the laws of Congress as a subject of interstate commerce, before the article has ceased to be an article of commerce between one state and another, it comes in conflict with a power which, in this particular, has been exclusively vested in the general government, and is therefore void. Fully admitting the police powers of the states, the court expressed itself to the effect that to extend the police power of a state over the subjects of commerce, nation-wide in character, not purely local and of minor concern, like dams, harbor and pilot regulations, bridges over navigable rivers, piers, docks, etc., would make commerce subordinate to that power and would enable a state to bring within its police power any article of consumption that a state might wish to exclude, whether it belonged to that which was drunk, or to food which was eaten, or to clothing which was worn; that while a state under its police powers may by law resist and prevent the introduction of disease, pestilence or pauperism from abroad, yet disease, pestilence and pauperism are not subjects of commerce, although sometimes among its attendant evils. They are not things to be regulated and trafficked in, but to be prevented, and as long as liquors are the subject of ownership and property and therefore the lawful subjects of exchange, barter, and traffic, not made by law unlike any other commodity in which a right of property and a right to traffic exist, then importation cannot be prevented by a state law; and as sale thereof by the consignee in the destination state is a constituent of commerce itself, the sale cannot be prevented by a state under claim of its control over the commodity under its police power. The court reviewed the position taken in the *License Cases* with respect to

the *silence* of Congress, and in opposition thereto held, as it had previously held in the *Bowman case*, that:

"The absence of any law of Congress on the subject is equivalent to its declaration that commerce in that matter shall be free. Thus the absence of regulations as to interstate commerce with reference to any particular subject is taken as a declaration that the importation of that article into the states shall be unrestricted."

The court overruled the decision in *Peirce v. New Hampshire* (*License Cases*) 5 *How.* 504, 12 *L. Ed.* 256, and held that liquor is a legitimate article of commerce, that an interstate commercial transaction in liquor is not complete upon delivery to the consignee, but extends to and includes the subsequent sale thereof by the consignee, and that, even when Congress is silent upon the subject, a statute of a state, prohibiting the sale of imported liquor by the consignee in an interstate transaction, where the sale is made in the unbroken original package, is unconstitutional and void, as repugnant to the commerce clause of the Constitution, granting to Congress alone the power to regulate commerce among the states.

In this and in the preceding cases of the same decisional trend were vigorous dissenting opinions, delivered in maintenance of the principle that the regulation of the sale and traffic in liquor is within the police power of a state, even to the prevention of sale after arrival and to the exclusion of liquor by importation.

The decision in the *Leisy case*, extending to an interstate commercial transaction in liquor the right of sale in the original package by the consignee in the destination state, regardless of the laws of such state prohibiting such sale, was rendered April 28, 1890, and there was immediately introduced in Congress a bill to meet that decision and to annul its force, which was enacted into law on August 8, 1890, and is known as the "Wilson Law".

The Wilson Act provides:

"That all fermented, distilled or other intoxicating liquors or liquids transported into any state or territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such state or territory be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such state or territory, and shall not be exempt therefrom by reason of being

introduced therein in original packages or otherwise." *Act* Aug. 8, 1890, *c.* 728, 26 *Stat.* 313 (*U. S. Comp. St.* 1901, *p.* 3177).

It thus appears that the power which the Supreme Court in the *License Cases* conceded to the states, in regulating or preventing a resale by a consignee of an imported article in the original package, was denied to the states by the Supreme Court in the *Leisy case*, and that the right thus first conceded, and then denied, was determined by the Wilson Law. The point of decision in the two named cases and the matter contemplated as the subject of the Wilson Law, as finally defined, was restricted to the right of a state to regulate or prevent a *resale* of liquor upon delivery, and did not extend to the right of a state to regulate or prohibit the *importation* of liquor, the law upon the latter point remaining as decided in *Bowman v. Chicago, etc., Railway Co., supra.*

Upon the enactment of the Wilson Law, two questions immediately arose: *first*, the constitutionality of the law in depriving the consignee of liquor in an interstate transaction of his theretofore recognized right to sell the liquor in the original package in the destination state, as an ingredient or constituent element of commerce; and, *second*, if constitutional, when and at what point in the interstate transaction did liquor lose its interstate characteristic and become "subject to the operation and effect of the laws" of the destination state, under the terms of the statute that "liquors transported into any state   *   *   *   *shall upon arrival* in such state be subject to the operation and effect of the laws of such state."

These questions and such others as were related to them have been considered and decided by the Supreme Court in a number of cases, to the leading ones of which reference will be made, showing the law as it stood from the date of the enactment of the Wilson Law in 1890 to the year 1913.

By these decisions, the sovereign powers of the states and of the United States over matters exclusively their own were again defined and asserted. In *re Rahrer*, 140 *U. S.* 545, 11 *Sup. Ct.* 865, 35 *L. Ed.* 572, the court said:

(a) "The power of the state to impose restraints and burdens upon persons and property, in conservation and promotion of the public health, good order and prosperity, is a power originally and always belonging to the states, not surrendered by them to the general government nor directly restrained by the Constitution of the United States, and essentially exclusive."

(b) "The power of Congress to regulate commerce among the several states, when the subjects of that power are national in their nature, is also exclusive. The Constitution does not provide that interstate commerce shall be free, but, by the grant of this exclusive power to regulate it, it was left free except as Congress might impose restraint. Therefore, it has been determined that the failure of Congress to exercise this exclusive power in any case is an expression of its will that the subject shall be free from restrictions or impositions upon it by the several states. *Robbins v. Shelby Taxing District*, 120 U. S. 489 [7 *Sup. Ct.* 592, 30 L. Ed. 694]. And if a law passed by a state in the exercise of its acknowledged powers comes into conflict with that will, the Congress and the state cannot occupy the position of equal opposing sovereignties, because the Constitution declares its supremacy and that of the laws passed in pursuance thereof. *Gibbons v. Ogden*, 9 *Wheat.* 1, 210 [6 L. Ed. 23]. That which is not supreme must yield to that which is supreme. *Brown v. Maryland*, 12 *Wheat.* 419, 448 [6 L. Ed. 678]."

(c) That Congress can neither delegate its own powers to a state nor enlarge the powers that belong to a state.

Recognizing these as firmly established principles, susceptible of dispute only in their application to the given facts of a case or to the precise terms of a statute, it was decided:

(1) That the right to have and use intoxicating liquors for personal purposes is denied no one by either state or federal laws.

(2) That intoxicating liquors constitute a legitimate subject of interstate commerce. *Vance v. Vandercook Co.*, 170 U. S. 438, 444, 18 *Sup. Ct.* 674, 42 L. Ed. 1100; *L. & N. R. R. Co. v. Cook Brewing Co.*, 223 U. S. 70, 32 *Sup. Ct.* 189, 56 L. Ed. 355.

(3) That liquor, as a designated subject of interstate commerce, may be governed by a regulation which divests it of that character, when that regulation is promulgated by a law of the federal government, prescribing one common rule, the uniformity of which is not affected or disturbed by variations in state laws dealing with the same subject. *In re Rahrer*, 140 U. S. 545, 561, 11 *Sup. Ct.* 865, 35 L. Ed. 572.

(4) That the right of a consignee to sell imported merchandise in the original package is not a right conferred or protected by the Constitution. *In re Rahrer*, 140 U. S. 545, 11 *Sup. Ct.* 865, 35 L. Ed. 572.

(5) That by the Wilson Law Congress divested interstate commerce in liquor of one of its theretofore interstate characteristics, namely, the right of sale by the consignee, not by delegating the federal power, over the subject to the states, nor by permitting the commerce in the commodity to be regulated by the states, but by bringing to bear directly upon interstate commerce itself, the force of its own rule applicable to all interstate transactions in liquor without regard to the local laws of the destination states, that the interstate commercial transaction in liquor shall terminate upon the arrival of the liquor in the destination state, and with the termination of the interstate transaction terminates the federal control, and thereafter begins the state control thereover. *In re Rahrer*, 140 U. S. 545, 564, 11 *Sup. Ct.* 865, 35 L. Ed. 572.

(6). That the Wilson Law, in so far as its purpose or operation is to divest liquor of its interstate commercial quality upon arrival in a destination state, and to prevent resale or other disposition thereof, except under the laws of the state in which it has arrived, is a valid exercise of the power conferred upon Congress by the commerce clause of the constitution. *In re Rahrer*, 140 *U. S.* 545, 564, 11 *Sup. Ct.* 865, 35 *L. Ed.* 572; *Rhodes v. Iowa*, 170 *U. S.* 412, 420, 18 *Sup. Ct.* 664, 42 *L. Ed.* 1088.

(7) That the expression of the Wilson Act, that liquor "shall *upon arrival* in [the destination] state be subject to the operation and effect of the laws of such state," did not mean arrival within state territory merely, but meant arrival at the point of completion of the interstate transaction, namely, in the hands of the consignee; that the Wilson Law conferred no right upon a state to forbid a common carrier to transport liquor from one state into another state, or to stop at the state line an interstate shipment of liquor, or otherwise to interfere with or apply its laws to such interstate shipment until the transportation was concluded by delivery to the consignee. *Rhodes v. Iowa*, 170 *U. S.* 412, 18 *Sup. Ct.* 664, 42 *L. Ed.* 1088; *Vance v. Vandercook Co.*, 170 *U. S.* 438, 18 *Sup. Ct.* 674, 42 *L. Ed.* 1100; *Heymann v. Southern Ry. Co.*, 203 *U. S.* 270, 27 *Sup. Ct.* 104, 51 *L. Ed.* 178, 7 *Ann. Cas.* 1130; *Adams Express Co. v. Kentucky*, 214 *U. S.* 218, 29 *Sup. Ct.* 633, 53 *L. Ed.* 972; *L. & N. R. R. Co. v. Cook Brewing Co.*, 223 *U. S.* 70, 32 *Sup. Ct.* 189, 56 *L. Ed.* 355.

(8) That a common carrier is not forbidden by the Wilson Law to transport liquor from one state into another state, even when by the laws of the latter state the shipment as well as the sale of liquor is prohibited, and that, on the contrary, such shipment, when it constitutes an interstate commercial transaction, is not only protected, but may be compelled, by the commerce clause of the Constitution, notwithstanding such a shipment may be in open violation of the laws of the state into which the shipment is made, or notwithstanding the carrier might have notice that the consignee intended to sell the liquor, when received, or in some other way to dispose of it in violation of the state law. *L. & N. R. R. Co. v. Cook Brewing Co.*, 223 *U. S.* 70, 32 *Sup. Ct.* 189, 56 *L. Ed.* 355; *Adams Express Co. v. Commonwealth*, 154 *Ky.* 462, 157 *S. W.* 908, 48 *L. R. A.* (*N. S.*) 342.

Thus stood the law with respect to state and federal control over the sale and shipment of liquor until the year 1913, when Congress enacted a statute known generally by the name of its authors as the "Webb-Kenyon Law".

The Webb-Kenyon bill, after its introduction, was subjected to vigorous debate and important amendment, with the result that the popular impression of that legislation has been gathered more from the controversy that revolved about it than from knowledge of the measure itself. It is not unnatural, therefore, that the popular conception of the law is that it confers upon a state the power absolutely and totally to prohibit the importation of liquor for any purpose, while an examination of the precise terms of the law shows a very different purpose and a very different power.

. ·The history of contemporaneous legislation, as well as legislative debates, may in rare instances be resorted to and considered by courts in searching for the meaning of a law when the meaning is obscure, and in discovering the evils intended to be remedied when those evils are in doubt or unknown. In view of the plain language and intent of the Webb-Kenyon Law, however, the court would not be justified in employing that means to aid it in reaching its conclusion, but in view of the popular misunderstanding of the law and of the purpose and extent of its provisions, entertained not by its authors and supporters in Congress, as disclosed by such of the debates as were presented to us in the briefs, but by those who have not studied and in some instances have not read the law, the court feels it to be within its province to correct this popular misconception, by adverting to the history of the legislation that surrounded the bill, and that resulted in its enactment.

. The Webb-Kenyon bill, as introduced into Congress, consisted of two sections. The first section of the bill provided, in substance, that the shipment or transportation of liquor from one state into any other, which liquor "is intended by any person interested therein, directly or *indirectly, or in any manner connected with the transaction*" to be received, possessed, or kept, or in any manner used, in violation of any law of such state, "enacted in the exercise of the police power of such state", is prohibited, and any "contracts pertaining to such transactions are declared to be null and void", and "no suit or action shall be maintained * * * upon any such contract, or *for the enforcement or protection* of any alleged right" based upon such contract, "or for the *protection* in any manner whatsoever of such prohibited transactions."

The expression "by any person * * * in any manner connected with the *transaction*" may have meant transaction of shipment, in which event the expression included common carriers; and the concluding expression, prohibiting the enforcement, by suit, of rights growing out of a contract and of "*protection* in any manner whatsoever of such prohibited transactions,"

manifestly contemplated the protection of the commerce clause of the Constitution.

The second section of the bill provided that any liquor transported into any state, or remaining therein for use, consumption, sale or storage shall upon arrival *within the boundaries* of such state, and *before* delivery to the consignee, be subject to the operation and effect of the laws of such state enacted in the exercise of its reserved police powers, to the same extent and in the same manner as though such liquor had been produced in such state. H. R. 17,593, 62d Congress, Introduced January 10, 1912, *Congressional Record*, February 8, 10, 11, 14, 1913, *p.* 2919.

The effect of the last section, which represents the popular conception of the law, would have been to overcome the decision in *Bowman v. Chicago, etc., Ry. Co.*, and to prohibit the transportation of liquor into any state that prohibited such transportation, and stop the shipment at the frontier, as it were, or, if it got in, then to apply to it the law which the Supreme Court in *Mugler v. Kansas* established as to the right of a state, under its police powers, to regulate and prohibit the sale of liquor within its borders. This is the bill and the legal effect of its provisions as it started on its passage.

The first thing that was done was the offer and rejection of an amendment to make criminal the transportation of liquors in interstate commerce intended to be used contrary to the law of the destination state. *Congressional Record*, February 12, 1913, *p.* 3081.

The next step was to eliminate from the bill the second section thereof. This is the section that in effect conferred upon the states the right to prohibit the importation of liquor by subjecting imported liquors to the operation of state laws upon arrival at the state boundary. The last step was to withdraw from the last part of the first section that part of the section that avoided contracts of transportation of liquor and withheld protection for prohibited transactions, and to strike out in the middle of the section the broad language, by which common carriers might be included among those connected "with the transaction," leav-

ing to be enacted into law the remainder of the first section of the bill. The law as enacted is as follows:

"That the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one state, territory, or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, into any other state, territory, or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, or from any foreign country into any state, territory or District of the United States, or place non-contiguous to, but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such state, territory, or District of the United States, or place non-contiguous to but subject to the jurisdiction thereof, is hereby prohibited."

The bill in its entirety was attacked in both houses of Congress, and upon its first passage was vetoed by the President of the United States, upon the ground that it was unconstitutional, and was passed over the President's veto on the first day of March, 1913.

Under authority of this act, the General Assembly of the State of Delaware enacted a statute, approved by the Governor on the eighth day of the following month, entitled "An act regulating the shipment or carrying of spirituous, vinous or malt liquor into local option territory, or the delivery of the same in such territory" (*Chapter* 139, *Volume* 27, *Laws of Delaware*), the provisions of which, so far as they relate to the phase of the case now under consideration, are:

"Section 1. That it shall be unlawful for any common carrier, knowingly to accept or receive for shipment, transportation or delivery to any person or place within local option territory, or to carry, bring into, transfer to any other person, carrier or agent, handle, deliver or distribute in local option territory, any spirituous, vinous or malt liquor, regardless of the name by which it may be called. * * *

"Section 4. This act shall apply to all packages of spirituous, vinous or malt liquor, whether broken or unbroken. * * *

"Section 6. That it shall be unlawful for any person to carry, bring or have brought any quantity of spirituous, vinous or malt liquor from any point within the State of Delaware into local option territory within said state greater than one gallon within the space of twenty-four hours."

In the case of *L. & N. R. R. Co. v. Cook Brewing Co.*, 223 *U. S.* 70, 82, 32 *Sup. Ct.* 189, 56 *L. Ed.* 355, decided after the enactment of the Wilson Law and before the enactment of the

Webb-Kenyon Law, Mr. Justice Lurton, in reasserting the law pertaining to the control of Congress over interstate commerce, said:

"By a long line of decisions, beginning even prior to *Leisy v. Hardin*, 135 *U. S.* 100, 10 *Sup. Ct.* 681, 34 *L. Ed.* 128, it has been indisputably determined:

"(a) That beer and other intoxicating liquors are recognized and legitimate subjects of interstate commerce.

"(b) That it is not competent for any state to forbid any common carrier to transport such articles from a consignor in one state to a consignee in another.

"(c) That until such transportation is concluded by delivery to the consignee, such commodities do not become subject to state regulation, restraining their sale or disposition."

Before the enactment of the Webb-Kenyon Law, therefore, there was no question that the State of Delaware was without power to enact into law the provisions of the Hazel Act so far as they relate to and affect interstate commerce. After the enactment of the Webb-Kenyon Law, and in the exercise of the power assumed to have been conferred upon it by that statute, the State of Delaware did what admittedly it could not have done before, and by the Hazel Law prohibited commerce in liquor between other states and prohibition districts in this state, when the liquor was to be used for any purpose, other than medicinal and sacramental.

Under this state of the law, the first question therefore is, how far and to what extent are the prohibitions of the Hazel Act authorized, aided or validated by the Webb-Kenyon Law, when considered with especial reference to the offense for which the defendant below was indicted? The defendant below, acting as agent for a common carrier, completed a shipment of liquor from the State of Pennsylvania to a prohibition district in the State of Delaware, by receiving the same and delivering it to the consignee in that district. It is admitted in the case stated that the liquor "was intended" by the consignee "to be used by him for his own consumption", and "he did not intend to sell or otherwise unlawfully dispose of the same." The Hazel Act prohibits the shipment of liquor into the prohibition districts of this state for any purpose (excepting the two designated), whether the liquor be intended to be used in violation of law or not. The

Webb-Kenyon Law prohibits the shipment of liquor only when the liquor is intended to be used in violation of the law of the state. *There is thus presented a case of a shipment of liquor for a lawful purpose, in violation of a state statute prohibiting the shipment of liquor for any purpose, enacted under authority of a federal statute, prohibiting the shipment of liquor for an unlawful purpose.* The first question for our determination, therefore is, whether the Webb-Kenyon Law prohibits the act with which the defendant below is charged, or makes valid the prohibition of such an act by a state statute. In other words, does the Webb-Kenyon Law apply to this case, and, if not, is the Hazel Law valid in so far as it prohibits the act committed by the defendant below? The answer to this question depends upon the meaning of the Webb-Kenyon Law, and the meaning given to that law by the court below constitutes the chief ground of error upon which this case is brought before us for review.

[9]   In the division of powers under our system of government, it is the function of the legislative department to make the laws and the function of the judicial department to enforce them. The courts are no more responsible for what a law may contain, so long as it is a valid enactment, than is the Legislature responsible for the manner in which the courts may enforce the law. The responsibilities of these departments are as separate as their functions.

[10]   When a law is validly enacted and its meaning plainly expressed, the one duty of the courts with respect to it is to enforce it. It is only when, by infirmity of expression, a statute is so framed that its meaning is in doubt, that courts are required first to construe a statute in order to know how to enforce it, and in so doing the one thing they seek is the intention of the Legislature, and when they have found it, they then enforce the law which the Legislature, and not the judiciary, has made.

In the judicial interpretation of laws, courts are guided by well recognized rules. When the language of a statute is plain and conveys a clear and definite meaning, courts give to the statute the exact meaning conveyed by the language, adding nothing thereto and taking nothing therefrom. Another mean-

ing, that by inference or implication might otherwise be gathered from it, is avoided. When the expression is confused and the meaning obscure, then the courts seek the intention of the Legislature by the light of the fundamental rule of looking for the purpose and object of the law, searching for the mischief intended to be abated and finding the remedy intended to be afforded.

Thus the Webb-Kenyon Law means exactly what its language conveys, and the meaning of the law fits precisely the situation it seems intended to remedy, and but for the fact that its meaning is questioned, it would receive from us neither interpretation nor exposition. But as the Webb-Kenyon Law was applied by the court below to the given facts of the case there tried, it becomes necessary on review to ascertain the meaning of the law in order to ascertain whether the law is applicable to this case.

Undoubtedly the purpose of the Webb-Kenyon Law, as finally enacted, was to enable the states more effectually to enforce their own laws in preventing and reducing the illicit sale of liquor, by restricting the supply to a point that discourages infractions of the law. Of this there is no doubt, but the question is how far in effectuating this purpose does the Webb-Kenyon Law go, namely, to the point of permitting a state to prohibit the importation of liquor for all purposes, or to the point of permitting a state to prohibit the importation when the liquor is intended for an unlawful purpose?

At the outset it is conceded that, before the enactment of the Webb-Kenyon Law, it was unlawful to sell liquor in certain prohibition districts in the State of Delaware; yet under the federal law as it then stood, notwithstanding the state law, a common carrier was protected by the commerce clause of the federal Constitution in transporting liquor into those districts, even when it had full knowledge that the liquor carried by it was intended to be used in violation of law.

It is fair to say that the plain intent of the Webb-Kenyon Law was to withdraw this protection from the carrier, and thereby aid the state in enforcing its law against the illegal sale of liquor, for the carefully chosen language of the act fits precisely this interpretation.

So also it must be conceded that before the enactment of the Webb-Kenyon Law, it was (as it still is) lawful in any part of the State of Delaware to possess and use intoxicating liquors, in the sense of having and consuming them, and a common carrier was protected in transporting liquor into those districts for that lawful purpose. If it was the purpose of the Webb-Kenyon Law to meet this latter situation, change this law and withdraw this protection from the carrier, in face of the lawfulness of the use to which the liquor was to be put, as recognized by the laws of both the state and federal governments, then such purpose must be disclosed by the law.

The language of the law is:

"That the shipment or transportation [of liquor] from one state * * * into any other state, * * * which said * * * liquor is intended, by any person interested therein, to be received, possessed, sold or in any manner used, * * * in violation of any law of such state, * * * is hereby prohibited."

By this language it is apparent, first, that the thing prohibited is the shipment or transportation of liquor; second, that such shipment or transportation of liquor is prohibited (a) when the liquor so shipped is intended to be received, possessed, sold or used in violation of the laws of a state, and (b) when that intention is entertained by any person interested in the liquor. From this analysis of the law it is likewise apparent, first, that all shipments of liquor are not by express language prohibited; and, second that the test of a shipment of the kind prohibited is the intent of a person, not interested in the shipment, but interested *in the liquor*, to receive, possess, sell or use the liquor in violation of the state law.

But it was urged at the argument, and it was held by the court below, that the effect of the Webb-Kenyon Law was to divest liquor of its interstate character in *all* cases and to prohibit *all* shipments of liquor into a state, when by state law all shipments for all purposes are prohibited, without regard to the lawfulness or unlawfulness of the purpose to which the liquor was intended to be put, upon the theory that the interest of the carrier in its contract and act of carriage of the liquor makes it a "person interested therein", within the language of the act, and

being interested in the liquor it is transporting into a state against the laws of such state forbidding such transportation, it must intend by the shipment to violate the state law against shipment, and thereby does the act prohibited by the Webb-Kenyon Law; in other words, a carrier cannot ship liquor without being interested in the liquor, nor can it ship liquor without intending to ship it, and without thereby intending to violate the state law against such shipment.

[11]    The Webb-Kenyon Law by its title purports to divest liquor of its interstate character only "in certain cases," and the law prohibits shipments of liquor into prohibition territory only in certain cases.

The Webb-Kenyon Law makes unlawful the thing it prohibits, and conversely it is fair to say that a thing not by it prohibited is not by it made unlawful. The statute says:

"That the shipment or transportation" of liquor into a state, "which said   *   *   *   liquor [meaning *when* said liquor] is intended by any person interested therein, to be received, possessed, sold or in any manner used,   *   *   *   in violation of any law of such state,   *   *   *   is hereby prohibited."

That is what the law prohibits. Then conversely the law must mean that the shipment or transportation of liquor into a state, when said liquor is *not* intended, by any person interested therein, to be received, possessed, sold or in any manner used, in violation of any law of such state, is *not* thereby prohibited. This seems to us a necessary deduction from the language used, for if the statute does not contemplate as an exception the shipment that might be lawful, then it prohibits all shipments, and if this is what was intended, it is hard to conceive why the intention was left to be deduced and construed from the language used, when simple and direct language might have been used, prohibiting outright any shipment for any purpose, as was used in the statutes of Kentucky, Tennessee, Iowa and Delaware. Before we could hold that Congress intended or attempted to part with any of its constitutional control over interstate commerce, Congress would have to grant or permit or otherwise validly confer upon the states such control by language that conveys a precise and unmistakable meaning to that effect, and not by language

from which the meaning must be sought by argument, inference or deduction.

It was held by the court below that if the Webb-Kenyon Law did not enable a state absolutely to prohibit all shipments of liquor into its territory, when the liquor was intended for *any* purpose, the Webb-Kenyon Law was but a re-enactment of the Wilson Law. With this view we do not concur. By the Wilson Law the *resale* by the consignee was the only thing prohibited, leaving the carrier free to transport liquor into the territory of a prohibition state, either for purposes made lawful or unlawful by the laws of such state. The Wilson Law affected interstate commerce, and divested commerce in liquor of its interstate character only to the extent of subjecting it to the state law and of depriving it of its right of resale *after delivery to the consignee*, and left the carrier under the protection of the commerce clause of the Constitution for the rest of the interstate transaction. Under this protection the carrier could import liquor into a prohibition state, whether the intended use of the liquor was lawful or unlawful. In fact under this protection a carrier could import liquor into a prohibition state, with full knowledge that upon arrival at destination and delivery to the consignee it was intended by him to be received, possessed, sold or otherwise used in violation of the laws of that state. This was the mischief intended to be remedied by the Webb-Kenyon Law, as this was the state of the law after the enactment of the Wilson Law and after the decision of the Supreme Court in *L. & N. R. R. Co. v. Cook Brewing Co.*, 223 *U. S.* 70, 32 *Sup. Ct.* 189, 56 *L. Ed.* 355, decided January 22, 1912, and the state of the law when the Webb-Kenyon bill was introduced in Congress and finally enacted on March 1, 1913.

To remedy this evil and to aid the states in preventing the shipment of liquor for unlawful purposes, the Webb-Kenyon Law attempted a very different thing from what the Wilson Law did and by clear expression withdrew or attempted to withdraw from the carrier of liquor intended for unlawful purposes the protection it theretofore had, and afforded the states a means by which they could more effectively reach and prevent the violation of their

liquor laws, when liquors were imported for the purpose of the violation of those laws.

We find nothing in the law which affords a means to the states to prevent the transportation of liquor by a common carrier when the liquor is intended for a lawful purpose.

The state courts of last resort that have thus far given an interpretation to the provisions of the Webb-Kenyon Law are the Court of Appeals of Kentucky, the Supreme Court of Tennessee, the Supreme Court of Iowa, and the Supreme Court of Kansas. *Adams Express Co. v. Commonwealth*, 154 *Ky.* 462, 157 *S. W.* 908, 48 *L. R. A.* (*N. S.*) 342; *Palmer v. Southern Express Co.* (*Tenn.*) 165 *S. W.* 236 (not officially reported); *Iowa v. U. S. Express Co.*, 145 *N. W.* 451 (not officially reported); *Kansas v. Columbia Brewing Co.*, 139 *Pac.* 1169 (not officially reported).

These courts gave to the Webb-Kenyon Law the same interpretation and meaning, as applied to the particular and different cases before them, that this court has given it in the case under consideration.

The Court of Appeals of Kentucky and the Supreme Court of Tennessee each held that the Webb-Kenyon Act did not prohibit the shipment of liquor or authorize a state to prohibit the shipment of liquor when the liquor was intended by the consignee for a lawful purpose, which was the case before them, and declined to consider the act in its relation to facts in which the intention was to put the liquor to an unlawful use. The Supreme Court of Iowa and the Supreme Court of Kansas held, conversely, that the act prohibited an interstate shipment of liquor when the liquor was intended to be used by the consignee for an unlawful purpose, which was the case before each of them, and expressly declined to consider whether the act prohibited the shipment of liquor in cases like the Kentucky case, the Tennessee case, and this case, in which the intention was to use the liquor for a lawful purpose. Neither one of the courts construed the act to prohibit interstate shipment of liquor for all purposes, that is, to be used for either a lawful or unlawful purpose, as neither court, of course, passed upon the phase of the act not raised by the case before it, but each court read the act with the meaning that left open a

question of the applicability and constitutionality of the act with reference to the phase of the act not before it. The interpretation given the Webb-Kenyon Law by each of these four courts, considered with respect to the different cases before them, is in complete harmony one with the other, and discloses that each found the law to mean precisely what this court has found it to mean.

The Hazel Law of the State of Delaware, which, with certain exceptions, makes it unlawful for common carriers to transport liquor either by interstate or intrastate shipments, into prohibition territory, without regard to the purpose for which the liquor so imported is intended there to be used, was either copied from a similar law of the State of Kentucky, or the two laws were taken from another law as a common source, for the provisions of each are essentially alike.

Under facts identical with the facts of this case, liquor was carried by an express company from a distant state into prohibition territory of the State of Kentucky, and there delivered to the consignee. For this offense the express company was proceeded against under the statute of Kentucky. In the case instituted against it, it appeared in an agreed state of facts that the—

"said liquors (so imported) were intended by said consignees, respectively, for their personal use, and were so used by them, and were not intended by them to be sold contrary to law, and were not sold by them."

The Court of Appeals of Kentucky (*Adams Express Co. v. Commonwealth*, 154 *Ky.* 462, 157 *S. W.* 908, 48 *L. R. A.* [*N. S.*] 342) being the court first called upon to pass upon the Webb-Kenyon Law, in an opinion delivered June 17, 1913, held that the Webb-Kenyon Law did not apply to the facts of that case, deciding that the Webb-Kenyon Law prohibited the shipment of liquor intended to be received, used or sold in violation of a state law and did not prohibit the shipment of liquor when there was no intention by some one interested in the liquor to violate the state law. With respect to the applicability of the law, the court said:

"This law specifies with particularity the character of transaction designed to be taken from under the protection of the commerce clause, and manifestly it was not intended by it to remove this protection from any other

character of shipment. In other words, if the transaction comes within the scope of the Webb-Kenyon Law, the commerce clause of the federal Constitution affords no protection from prosecution instituted under the laws of the state; but, if the transaction does not come within the scope of this law, then the commerce clause of the federal Constitution is equally as effective in its protection of carriers as it was before the enactment of this law.    *    *    *

"The purpose, and the only purpose, of the Webb-Kenyon Law,    *    *    * was to withdraw from interstate shipments of intoxicating liquor the complete protection it had under the principle announced in the *Cook Brewing Company case*, as well as in many other cases; and assuming, as we do, that the Webb-Kenyon law is valid legislation, there can be no doubt that *section* 2569a, *Ky. St.*, is operative when applied to intoxicating liquor that is shipped as an interstate transaction to a consignee living in local option territory in this state to be received, possessed, sold, or in any manner used in violation of any law of this state. If, however, the liquor is not intended by any person interested therein to be received, possessed, sold or in any manner used in violation of the laws of this state, then, notwithstanding the Webb-Kenyon Law, its carriage and delivery is as fully protected by the commerce clause of the federal Constitution as it was before the enactment of the Webb-Kenyon Law.    *    *    *

"It therefore appears that the issue in this case really comes down to this: Was the liquor involved in this transaction intended by any person interested therein to be received, possessed, sold, or in any manner used in violation of any law of this state? It is shown by the agreed state of facts, when considered in the light of the Constitution and laws of the state, and the opinions of this court, that it was not. This being true, the aid of the Webb-Kenyon Law cannot be invoked to secure the punishment of the carrier, as it does not prohibit a common carrier from receiving, carrying, and delivering, as an interstate transaction, intoxicating liquor to the consignee when it is not intended by any person interested therein to be received, possessed, sold, or in any manner used in violation of the laws of this state, or withhold from such a transaction the protection afforded by the commerce clause of the federal Constitution. As to this character of transaction, the Webb-Kenyon Law has no application, and, having no application, the law, as it existed, before the enactment of this legislation, is in force, and, being in force, the carrier cannot be punished for receiving, carrying, and delivering, as an interstate transaction, intoxicating liquor in local option territory to a consignee who purchased it at a point in another state, and when it is not intended by any person interested therein to be received, possessed, sold, or in any manner used in violation of the law of this state. If, however, the liquor is intended to be received, possessed, sold, or in any manner used in violation of the law of this state, then the Webb-Kenyon Act applies, although the transaction may be an interstate one, and the carrier is not protected from the punishment imposed by *section* 2569a of the statute by the commerce clause of the federal constitution, under which it would have been exempt from punishment before the enactment of the Webb-Kenyon Law, which was intended to and does withdraw from the character of shipments therein mentioned the protection theretofore afforded by the commerce clause.

"The result of our views on the whole case is that whether a carrier of an interstate shipment of liquor subjects itself to punishment or not depends on the use to which the person to whom it delivers liquor intends to put it. If this use violates a law of the state, then the carrier may be punished; if it does not, the carrier has not committed any offense."

*Adams Express Co. v. Commonwealth*, 154 *Ky.* 462, 157 *S. W.* 913, 48
*L. R. A.* (*N. S.*) 342.

The case of *Palmer v. Southern Express Co.*, 165 *S. W.* 236,
decided by the Supreme Court of Tennessee, at its December
Term, 1913, and not yet officially reported, was the second case
before a state court of last resort, involving the Webb-Kenyon
Law. In that case the provisions of the statute of the State of
Tennessee relating to interstate shipments of liquor into that
state were held by the court to amount to an interference with
interstate commerce and therefore repugnant to the commerce
clause of the federal Constitution. It was contended however,
that the various provisions of the Tennessee statute so held
invalid were saved by the Webb-Kenyon Law. The Supreme
Court of Tennessee disposed of this contention by giving to the
Webb-Kenyon Law an interpretation that made it inapplicable
to the case before it, and in doing so used the following language:

"It is perceived that the thing which the act (Webb-Kenyon Law)
prohibits is the interstate shipment or transportation of the liquors men-
tioned therein, when 'intended by any person interested therein, to be received,
possessed, sold or in any manner used, either in the original package or other-
wise, in violation of any law of' the state, etc., into which the shipment is
made.

"It is enough to say for the disposition of the case before us that it does
not appear that the liquors shipped were intended to be sold, or used in viola-
tion of any law of the state; and therefore the act does not apply to the
present controversy. It appears from the facts stated in the bill, confessed
by the demurrer, and agreed to on the record at the hearing in the court below,
that the liquors were purchased for the personal use of complainant and his
family. This was a lawful use, and indeed permitted by the statute in ques-
tion. * * * The act therefore does not apply to the present contro-
versy. A vigorous attack is made on the constitutionality of the act, but
we do not deem it essential or even proper, to go into this question, since
the view already stated is sufficient to dispose of the case in so far as the
Webb-Kenyon Act relates to it.

"But, before passing from this phase of the case, we desire to add, in
order that the present opinion may not be misunderstood, that what we
have just held as to the inapplicability of the Webb-Kenyon Act to the case
before us, is not intended to cover those instances in which sales of liquors
are made in a foreign state for shipment into this state to be sold or used in
violation of the prohibition laws of this state. * * * What we have
said as to the certificates or statements or superscriptions on the packages,
we apply in the present opinion only to intoxicating liquors shipped into this
state for the personal use of the consignee and his family, that only being the
nature of the case before us; nor do we desire to be understood as expressing
any opinion as to whether there can be constitutionally withdrawn from the
operation of the interstate commerce laws, an article otherwise of a com-

mercial nature where an illegal intent is not found either directly or circumstantially to have existed at the time in the mind of the seller as well as in the mind of the buyer.   *   *   *   In short, the present opinion is confined only to the cases wherein the shipment is for the personal use of the consignee or his family.   It is our duty to so confine the decision."

The Supreme Court of Iowa next passed upon the Webb-Kenyon Law.   The decision in the case of *Iowa v. U. S. Express Co.*, 145 *N. W.* 451, rendered February 17, 1914 (not yet officially reported), was based upon a finding of fact that the consignee received the shipment of beer with intent to resell the same in violation of a law of Iowa, under circumstances that charged the carrier, the United States Express Company, with knowledge of that intent, and "that in so far as this case is concerned, the question of purchase and *shipment* to a consignee *for his own personal use* is entirely eliminated."

The Supreme Court of Iowa interpreted the Webb-Kenyon Law to prohibit a shipment of liquor into a state contrary to the laws of that state when the liquor was intended by the consignee to be sold in violation of the law of that state.   With respect to a case like ours, however, where liquor was shipped into the state not intended by the consignee to be sold in violation of the law of this state, but intended by him to be used in a manner lawful under the laws of the state, the Supreme Court of Iowa, in order to avoid an adjudication upon a state of facts not before it, said:

"*Eliminating*, as we must for the purposes of this case, the question as to an interstate shipment *for the personal use* of the buyer and the consignee, there is no room for doubt as to the proper interpretation of the act. It does just what the title says it was intended to do, to wit, divest intoxicating liquors of their interstate character *in certain cases*, and these cases are specifically set out in the act itself.   This is to say the shipment or transportation of intoxicating liquor from one state to another *when* such shipment is intended by any person therein to be received, sold or used in violation of any law of such state (to which the shipment is made) is prohibited.   This is the sum and substance of the act; and that it has reference to such shipments as are involved in this case clearly appears."

The case of *State of Kansas v. Columbia Brewing Co.*, 139 *Pac.* 1169, decided by the Supreme Court of Kansas in April of this year (and not officially reported), is the last judicial pronouncement by a state court upon the Webb-Kenyon Law of which we have knowledge.   From the statement of facts as con-

tained in the opinion of the court in that case, it appears that
the defendant, Columbia Brewing Company, shipped a car load
of beer from the City of St. Louis, in the State of Missouri, to the
Town of Corona, in the State of Kansas, and that upon its arrival
at its destination in Kansas, and before delivery to any one, it
was seized by the sheriff. At the trial the beer was claimed by
the brewing company, but the court found that "the beer *was
being used* in violation of the laws" of the State of Kansas, and
ordered it destroyed, and the brewing company appealed. It
further appears that the beer was consigned to the shipper's order,
with a direction on the waybill to notify one James Depoli. The
shipment was made according to a practice that had prevailed
between the brewing company and Depoli for over a year, during
which time Depoli had received from the brewing company seventy-
two car loads of beer, for which he had paid more than forty-three
thousand dollars. When a car would arrive, Depoli would be
notified. He would then find at the local bank a draft drawn
on him by the brewing company for the price of the consignment,
and upon taking up the draft, he would be handed a sealed
envelope, which would contain the bill of lading of the consign-
ment, with which Depoli would obtain possession of the beer
from the carrier. It also appears as facts that:

"Depoli was engaged in the wholesale liquor business in Cherokee County
*in violation of law*, and had ordered the car load of beer in question a few
days before its arrival at Corona *for use in his business*."

The statutes of the State of Kansas—

"prohibit the sale of intoxicating liquors, except that certain wholesale
druggists may sell alcohol in specified quantities to certain registered phar-
macists for medicinal, mechanical and scientific purposes. Provision is
made for the seizure and condemnation of intoxicating liquors kept or used
in violation of law."

Before passing upon the question of law raised by the facts
as stated, the court made allusion to the conditions that pre-
vailed at the point of consignment, showing a population out of
harmony with the restrictive features of the state law against the
sale of liquor, and disclosing a situation in which the enforcement
of those laws was attended with great difficulty, when violators of

the laws were encouraged and aided by wholesale liquor dealers supplying liquors in large quantities. Reference was also made to the fact that:

"The Wilson Law, which permitted shipments of liquor to retain their interstate character until delivery to the consignee, * * * left the state law subject to evasions embarrassing to its administration."

Thus stating local conditions and the limited effectiveness of the Wilson Law to meet them, the court makes clear its understanding of the purpose and effect of the Webb-Kenyon Law by saying:

"The act of March 1, 1913, by suffering the police power of the state to attach to interstate shipments of liquor *intended for unlawful uses* before delivery exactly meets the condition presented by this record, and permits the state effectually to enforce a policy deemed highly essential to its welfare.

"It is indeed true that the Supreme Court of the United States has many times declared that intoxicating liquors are recognized and legitimate subjects of interstate commerce. This declaration, however, has always been made in accordance with existing law. Congress has now spoken upon the subject in such a way that the declaration must be qualified. Intoxicating liquors are recognized and legitimate subjects of interstate commerce only *when not intended for sale or use in violation of the laws of the destination state.* The result is that the fact that the consignment in controversy was still in transit from the state of its origin did not protect it from condemnation consequent upon the finding of the court that *it was intended for unlawful use* in Kansas."

The rulings of the Supreme Court of Kansas and of the Supreme Court of Iowa are in entire harmony one with the other and are consistent with our understanding of the Webb-Kenyon Law as to its applicability to cases similar to the cases before those two courts.

The rulings of the Court of Appeals of Kentucky and of the Supreme Court of Tennessee are likewise in accord one with the other and with our understanding of the inapplicability of the Webb-Kenyon Law to cases like the cases before those two courts and like the case before us, which in point of fact are precisely the converse of the cases heard in Kansas and Iowa. The rulings by these four state courts of last resort and the holding of this court in the case now under consideration disclose in so far as they were called upon to express their views, that each court read the Webb-Kenyon Law in the same way and gave to its language the same meaning.

The Webb-Kenyon Law has been submitted for consideration to two federal courts, before one of which its constitutionality was contested and before the other the question of its applicability was raised.

The first court was the United States District Court for the District of Oregon, and the case was the *United States ex rel. F. Zimmerman & Co. v. Oregon-Washington Railroad & Navigation Co. et al.* (*D. C.*) 210 *Fed.* 378. From the opinion of the District Judge in that case, the facts of the case and the point of decision seem to be substantially these: The law of the state of Idaho prohibits the shipment and delivery of liquor to any person at any place in that state where the sale of liquor is prohibited, except for certain specified purposes, and the Webb-Kenyon Act of the Congress of the United States in effect prohibits the shipment or transportation of liquor into the State of Idaho, which liquor is intended to be received, possessed, sold or used in violation of any law of the said state.

In conformity with their understanding of the statute of Idaho and the act of Congress, the defendant railroad companies promulgated a rule whereby they refused to receive liquor for shipment and to transport liquor from points outside of the State of Idaho to points within a prohibition unit of that state. The plaintiff prayed for a mandamus requiring the defendant railroad company to accept in Oregon for transportation, and to ship into Idaho, a gallon of whisky consigned to a resident of a prohibition district in that state and intended for his personal use.

The court held that the Idaho statute was broad enough to make unlawful all interstate shipments of intoxicating liquor, although intended for the personal use of the consignee, and that the District Court in Oregon sitting as a *nisi prius* court in another jurisdiction should so consider the Idaho law until it is otherwise interpreted by the courts of Idaho, and especially in a case where it is sought by mandamus to compel a defendant to violate the terms of a statute.

The question of whether the Webb-Kenyon Law was applicable to the case does not appear from the opinion to have been considered. The constitutionality of the act, however, was raised;

but the judge took the position that the constitutionality of the Webb-Kenyon Act can be determined only by the Supreme Court of the United States, and until that court has passed upon it he conceived it to be the duty of a court of original jurisdiction, such as his, to treat the legislation as valid, and held in dismissing the petition that:

"The law is not so clearly unconstitutional as to justify this court in compelling the defendant to violate it."

The United States District Court for the District of Minnesota is the other federal court in which questions under the Webb-Kenyon Law were submitted for consideration, and the case is *Theo. Hamm Brewing Co. v. Chicago, Rock Island & Pacific Railway Co.*, 214 *Fed.* —. In this case, the procedure was in effect the same and the facts were in the main similar to those in the case before the District Court for the District of Oregon, but were sufficiently differentiated to enable the court before passing upon the constitutionality of the act to inquire into and determine its applicability.

From the opinion delivered and the decree entered by the United States District Court for the District of Minnesota, it appears that an association of railroads, describing themselves as "Western Trunk Lines", of which the defendant railway company was one, had promulgated a rule forbidding their employees to receive liquor in the State of Minnesota and to ship and transport it into the State of Iowa, even when the liquor was intended for personal use and private consumption, and that the plaintiff in the State of Minnesota offered to the defendant for shipment into the State of Iowa a gallon of whisky which the defendant railway company, through its agents, and acting in obedience to the rule before mentioned, refused to accept and to ship. A bill was filed by the plaintiff in the District Court, praying that the railway company be enjoined and restrained from refusing to accept, receive, transport, carry or deliver liquor sold in Minnesota by the plaintiff to persons residing in Iowa. In pursuance with the prayer of the plaintiff, the court decreed that the defendant railway company be permanently enjoined and restrained from refusing or failing to accept, receive, transport, carry or

deliver liquors which may thereafter be sold in Minnesota by the plaintiff to persons residing in Iowa, who shall have purchased the same for their own personal use and private consumption, and who shall direct that the same be transported and delivered to them in Iowa, and that the defendant be commanded to accept, receive, transport and deliver all of the same, and that the defendant railway company be restrained and enjoined from applying or putting into effect the said rule, being the circular of the Western Trunk Lines, in so far as the same forbids or relates to the shipment of liquors from Minnesota to Iowa intended for the personal use and private consumption of the consignee.

This decree was entered by the District Court upon the reasoning that was disclosed by the opinion of Charles A. Willard, Judge, which is as follows:

"The Webb-Kenyon Law declares unlawful the shipment of intoxicating liquor which 'is intended by any person interested therein to be received, possessed, sold or in any manner used, either in the original package or otherwise, in violation of any law of such state' into which it is shipped.

"The beer which Moss, a resident of Iowa, ordered from the plaintiff, whose brewery is established at St. Paul, Minn., and which was to be shipped over the defendant's line of railroad, was not intended by either Moss or the railroad company to be received, possessed, sold, or used in violation of any law of Iowa.

"The law of Iowa does, however, prohibit the transportation by any common carrier of intoxicating liquors, unless the person to whom the liquor is consigned has a permit. But the Webb-Kenyon Law while it says that the liquor must not be received, possessed, sold or used in violation of law, does not say that it shall not be transported in violation of law.

"If it had been the intention of Congress to prohibit the procurement from points outside of the state by a citizen of Iowa of intoxicating liquors for his own personal use, it would have been very easy to have indicated that by prohibiting the transportation of all interstate shipments.

"Assuming, as I do, that the law is valid, I hold that it does not apply to this case."

The great volume of cases that record the controversies that for nearly a century have revolved about the commerce clause of the federal Constitution disclose that, whatever deviation there may have been in some of its rulings, to one principle the Supreme Court of the United States has uniformly, consistently and steadfastly adhered, as a fixed and established principle of constitutional government, extending to and binding alike upon the governments of the states and of the United States, and

that principle is that, under the commerce clause of the federal Constitution, the federal government has absolute and exclusive control over commerce between the states, that over interstate commerce the federal government is supreme, and that any interference by a state government, that amounts essentially to a regulation of commerce among the states, is repugnant to the federal Constitution and is void. In the exercise of its control over interstate commerce, the federal government, through Congress, may limit commerce between the states, which otherwise shall be free, or it may restrict it in certain features, or prohibit it altogether in certain commodities. When this is done by Congress it is valid. If attempted by a state, it is void. For these reasons it is admitted that, prior to the enactment of the Webb-Kenyon Law, the State of Delaware could not have validly enacted a statute making it unlawful to ship liquor from another state into a prohibition district of this state for any purpose, such an act being beyond its own power and not being sanctioned by Congress either express or implied. But by the Webb-Kenyon Act, Congress expressed its sanction to such a law as the State of Delaware might desire to enact, prohibiting the shipment of liquor from other states into certain districts of this state when it was there to be received, possessed, sold or used in violation of the law of this state. Upon authority of this act the State of Delaware enacted the Hazel Law prohibiting with like intent the shipment of liquor from other states into prohibition districts of this state, there to be used for unlawful purposes. To this extent the Hazel Law is valid, if the Webb-Kenyon Law is valid. But the State of Delaware went further and by the same law prohibited the shipment of liquor from other states into prohibition districts of this state there to be used for purposes recognized by the act itself to be lawful. For this much of the Hazel Law the State of Delaware was without authority of its own and without the aid of the Webb-Kenyon Act, for the Webb-Kenyon Act did not prohibit, nor did it authorize a state to prohibit, the imporation of liquor into a prohibition territory, when the liquor was intended for a lawful purpose. The Hazel Act, therefore, in so far as it prohibits the shipment of liquor from another state into a

prohibition district of this state, when the liquor is not intended to be received, possessed, sold or in any manner used in violation of the laws of this state, but is intended for a lawful purpose, is an enactment without constitutional authority, and when invoked in such cases, amounts to an interference with interstate commerce, and is therefore void.

[12] The authority that confers upon the federal government its supreme control over commerce nation-wide in extent recognizes the supreme control by a state over commerce that is entirely within its own borders. The Hazel Law, therefore, is a valid enactment in so far as it regulates, limits or prohibits the shipment of liquor from one part of the State of Delaware into the prohibition districts in another part of the state. The validity of the Hazel Law and the obligation of all to conform to that law, so far as it prohibits intrastate shipments of liquor, is not open to dispute. *N. O. & T. R. R. Co. v. Commonwealth*, 126 *Ky.* 563, 104 *S. W.* 394; *L. & N. R. R. Co. v. Cook Brewing Co.*, 223 *U. S.* 70, 82, 32 *Sup. Ct.* 189, 56 *L. Ed.* 355; *Adams Express Co. v. Commonwealth*, 154 *Ky.* 462, 157 *S. W.* 908, 48 *L. R. A.* (*N. S.*) 342; *Bowman v. Chicago, etc., Ry. Co.*, 125 *U. S.* 465, 493, 501, 8 *Sup. Ct.* 689, 1062, 31 *L. Ed.* 700; *Mugler v. Kansas*, 123 *U. S.* 623, 8 *Sup. Ct.* 273, 31 *L. Ed.* 205.

Much was said in the argument touching the validity of the Webb-Kenyon Law, but as we have reached the conclusion that the prosecution against the defendant below must fail because this legislation is not applicable under the agreed facts to the transaction for which he was indicted, there is for that reason no case before us calling for a consideration of, or justifying a decision upon, the constitutionality of that legislation. In disposing of this case, we are not called upon to assert or deny the constitutionality of the Webb-Kenyon Law. That is a subject for the consideration of this court and for determination by the court having authority to render final judgment, upon a proper case being presented.

We are of opinion that upon the facts of this case, and under the laws of the State of Delaware and of the United States of America, a crime punishable under the laws of the State of Dela-

Opinion—Judgment Reversed.

ware has not been stated or shown to have been committed by the defendant below, and that the charge to the jury by the court below, based upon a contrary opinion, constitutes error, and that the judgment entered upon the verdict rendered in pursuance therewith should be reversed.