MARSDEN et al. v. TROY, Co. Atty.
(No. 5785.)

(Court of Civil Appeals of Texas. San Antonio.
Nov. 1, 1916. Rehearing Denied
Nov. 29, 1916.)

1. ELECTIONS ⊜➾227(1) — CONDUCT — IRREGULARITIES.

As Const. art. 6, § 2, providing that persons of foreign birth having the qualifications provided for natives who have declared their intention to become citizens of the United States, shall be deemed qualified electors, designated a special class, if a proclamation by election officers that no man not born in the United States, unless he had his final naturalization papers, would be permitted to vote in an election to determine whether the sale of intoxicating liquors would be prohibited in a county, was made known and a sufficient number of this class was prevented from voting to overcome the majority in favor of prohibition and change the result, whether they presented themselves at the polls or not, the election was void.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 197, 198; Dec. Dig. ⊜➾227(1).]

2. ELECTIONS ⊜➾285(3)—CONTESTS—PETITION—SUFFICIENCY.

Although when an election is attacked on the ground of the exclusion of individual voters, the name of each individual must be alleged, in an action to contest an election an allegation in the petition that an announcement was made before the election that a certain class of voters would be excluded from voting; that a number of votes sufficiently large to have changed the result of such election were prevented by such announcement from attending the polls—was sufficient to form a basis of proof of such facts without naming the voters of the class.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 269, 274; Dec. Dig. ⊜➾285(3).]

3. ELECTIONS ⊜➾285(3)—CONTEST—PETITION—SUFFICIENCY.

In an action to contest an election, a petition, alleging that in several precincts, the officers of the election proclaimed publicly that no man not born in the United States would be allowed to vote unless he had his final naturalization papers, and that the announcement was made in three precincts named, and was circulated throughout the precincts, was sufficiently definite in naming the precincts in which the class of voters was excluded and the officers who announced that the class would be excluded.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 269, 274; Dec. Dig. ⊜➾285(3).]

4. ELECTIONS ⊜➾73—QUALIFICATION OF VOTERS—POLL TAX RECEIPT—STATUTE—"AFFIDAVIT" OATH.

Under Rev. St. 1911, art. 2952, providing that if a citizen, after receiving his poll tax receipt or certificate of exemption, removes to another county or another precinct in the same county, he may vote at an election in the precinct of his new residence by presenting his poll tax receipt, or certificate of exemption, or his written affidavit of its loss, to the precinct judges, and by making oath that he is the person described, etc., an "affidavit" being an "oath" reduced to writing, and the oath only being for purposes of identification, the requirement of an affidavit is mandatory, but only with regard to a voter who has lost his receipt or certificate, while that in regard to an oath is only directory, so that votes of electors who had paid their poll taxes and removed to another precinct, but made neither affidavit nor oath, were not illegal where

their receipts or certificates were not lost, and the oath was not required by the election officers.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 69, 70; Dec. Dig. ⊜➾73.

For other definitions, see Words and Phrases, First and Second Series, Affidavit.]

5. INTOXICATING LIQUORS ⊜➾35—ELECTIONS—COUNT OF VOTES—STATUTE—CONSTRUCTION—"MAJORITY VOTE."

Under Const. art. 16, § 20, providing that the Legislature shall enact a law whereby the qualified voters of any county, etc., by a "majority vote," etc., may determine whether the sale of intoxicating liquors shall be prohibited, and Rev. St. 1911, art. 5723, providing that if a majority voting shall vote against prohibition, the court shall make an order declaring the result, etc., article 3062, declaring that illegal votes shall be cast out and article 5720, requiring that officers holding a local option election conform to general laws, the result of an election on the question of prohibition is determined by a majority of qualified voters voting, and no inquiry as to the whole number of persons entitled to vote is necessary.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. § 42; Dec. Dig. ⊜➾35.

For other definitions, see Words and Phrases, First and Second Series, Majority Vote.]

6. ELECTIONS ⊜➾72—QUALIFICATIONS OF VOTERS—"RESIDENCE."

That a man's wife and children resided on their homestead fixed his residence there, although he may have taken but one meal a day and spent the rest of his time on another farm.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 67, 68, 70; Dec. Dig. ⊜➾72.

For other definitions, see Words and Phrases, First and Second Series, Residence.]

7. ELECTIONS ⊜➾225—BALLOTS.

A voter should not be allowed to repeat his vote because he violated the law in casting the first one.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 195; Dec. Dig. ⊜➾225.]

8. DOMICILE ⊜➾8—EVIDENCE—PRESUMPTIONS.

The presumption that every man has a fixed domicile applies as well to a single as to a married man.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. §§ 36, 37; Dec. Dig. ⊜➾8.]

9. ELECTIONS ⊜➾73—QUALIFICATIONS OF VOTERS.

As residence is largely a matter of intention, made to appear by all the facts and circumstances of the case, and absence from place of residence will not alone destroy a residence once fixed, that a voter had been abroad and out of the state a great deal, nothing being shown with regard to his intention, will not destroy his right to vote.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 69, 70; Dec. Dig. ⊜➾73.]

Appeal from District Court, Bee County; J. F. Mullally, Judge.

Action by A. C. Marsden and others against Charles Troy, County Attorney. Judgment for defendant and plaintiffs appeal. Reversed and remanded.

Dougherty & Dougherty, B. D. Tarlton, Jr., and G. C. Robinson, all of Beeville, for appellants. Thomas, Milam & Touchstone, of Dallas, and Beasley & Beasley, J. Ed Daugherty and Charles Troy, all of Beeville, for appellee.

⊜➾For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

FLY, C. J. This is a contest of an election held in Bee county, on January 8, 1916, for the purpose of determining whether the sale of intoxicating liquors should be prohibited within the bounds of that county. The proper authorities declared that the election resulted in favor of the prohibition of the sale of·intoxicating liquors within Bee county, and appellants, who are citizens and property holders, instituted this suit. The trial judge, after hearing the evidence, declared that prohibition had been adopted by a majority of 29 votes; there being 618 votes for prohibition and 589 votes against.

[1] The first assignment of error assails the action of the court in sustaining a special exception to the thirteenth paragraph of the petition. The statement of the appellants shows the exception was sustained to only that part of the paragraph which failed to name the voters who were prevented from attending the polls "in several precincts" by the proclamation of officers of the election that "no man not born in the United States would be allowed to vote unless he had his final naturalization papers, and that it would be necessary for him to produce them in order to be entitled to vote." The object of the allegation was to raise the issue of a certain class of qualified voters being deprived of their votes by the announcement that none of the class would be permitted to vote, whereby they were prevented from attending the polls.

It is provided in article 16, § 20, of the Constitution of Texas that the Legislature should, at its first session, after the adoption of the Constitution, enact a law providing that the qualified voters of any county, and city, or subdivisions of the county, might, by a majority vote, determine from time to time whether the sale of intoxicating liquors should be prohibited within the prescribed limits. In compliance with the command of the Constitution an act was passed, which has, from time to time, been amended, which act is comprised in title 88 of the Revised Statutes known as the "Local Option Statutes," authorizing "the qualified voters" of any county or any political subdivisions thereof, or of any city or town, to vote on the prohibition of the sale of liquor, and prescribing rules for holding such elections.

Under the Constitution (article 6, § 2) every male person of foreign birth, not subject to the disqualifications named in section 1, and having the qualifications provided for natives, who, not less than six months before any election at which he offers to vote, shall have declared his intention to become a citizen of the United States in accordance with federal naturalization laws, and shall have resided in this state one year next preceding the election and the last six months in the county in which he \offers to vote, shall be deemed a qualified elector. Such elector, as a matter of course, would be fully qualified

by the constitutional provision to vote on the question of prohibition as well as for officers, or on other questions, and it will be conceded by every one that it was improper and illegal to refuse persons living in the precinct of the voting, and possessing the other qualifications prescribed in the Constitution and laws, the right to vote.

It may be accepted as law that where the officers of an election have adopted an erroneous rule in regard to the qualifications of voters which affects a class of voters and which has become generally known to the persons excluded by it, members of the class would not waive their rights by absenting themselves from the polls. The offer of their ballots after the promulgation of the rule excluding them would be an idle and useless formality. McCrary on Elections, § 235. Still under that rule it would be necessary for the contestant, basing his suit on the ground of the rule excluding a class, to allege and prove that a sufficient number of voters affected by the rule had not, on account of it, participated in the election, as probably to have changed the result.

In the case of Howell v. Pate, 119 Ga. 537, 46 S. E. 667, negroes as a class were excluded from voting solely on account of color, and the Supreme Court of Georgia held that·as such exclusion affected a sufficient number to alter the result, the election was void. That case was cited in the case of Coggeshall v. City of Des Moines, 138 Iowa, 730, 117 N. W. 309, 128 Am. St. Rep. 221, and the Supreme Court of Iowa held, in a case where women as a class had been excluded from voting:

"Had the election officers gone no farther than to refuse the votes of the women which were actually tendered, the result could not be disturbed, for in that event enough were not rejected to have changed the result. But the refusal was not based upon disqualification peculiar to the individuals, but as members of a class. The evidence shows conclusively that the denial was directed to all women as members of a class."

The court followed the proposition quoted by reviewing the facts that tended to show that no woman would have·been permitted to vote, no matter how many may have presented themselves, and that this fact was made known to the women by refusal to erect separate voting booths for them, as required by law, by the opinion of the city solicitor denying the right of women to vote, and was announced through the different clubs and through the daily press which gave widest publicity to it. It was alleged and proved in that case that the votes of the·women would have been many times the majority given in favor of the proposition that was voted upon. The court said:

"According to the last state census, there were 19,179 native-born women above 21 years of age residing in Des Moines, or 741 more than there were men of like age, and no time need be wasted in deducing from this proof that more qualified female voters than were necessary to overcome the majority resided in the city June 20, 1907, the day of·the election."

In the case of Renner v. Bennett, 21 Ohio St. 431, the votes of the inmates of an asylum were not accepted through an error on the part of the election officials, and it was held that the election was a nullity, the legal votes rejected being in excess of the majority given at the election.

Summing up the result of opinions on the subject of rejection of certain classes of votes, it is stated in Ruling Case Law No. 9, pp. 1147, 1148, § 139:

"There is a distinction, however, between depriving an individual of the ballot and the denial thereof to an entire class of voters, for where the body of voters denied the privilege as a class is numerous enough to have changed the result, the denial is then in the nature of oppression, and operated to defeat the very purpose of the election; that is, of ascertaining the choice or sentiment of the electorate. Where voters are rejected because they belong to a certain class, it is not necessary to establish the fact that those who actually presented themselves and were rejected were sufficient to change the result of the election. The erroneous rule adopted by the election officers affects the entire class, and they may submit to it without waiving any rights. Though they do not present themselves at the polls and offer their ballots, they have the right to take notice of the decision of the board in other cases precisely like their own."

In view of the authorities on the subject of rejection of voters by class, we hold that where there are allegations and proof that a certain class of voters was prevented from voting and the fact was made known and the members of the class thereby prevented from casting their ballots, whether they presented the same at the polls or not, and the number was sufficient to have overcome the majority and changed the result, the election would be void, irrespective of how the rejected class may have voted had the members been permitted to cast their ballots. It is the act of rejecting the body of voters of a certain class in the face of the Constitution that invalidates the election, if the number is sufficient to change the result of the election. If it was made known to the voters of a precinct that no foreign voters who had not obtained full naturalization papers would be allowed to vote, it would have been silly and unprofitable for each member of the class to have gone through the farce of having his vote rejected.

It is contended that no announcement was made as to any class of voters, but merely that certain qualifications were required of the voters as they presented themselves, and that foreign voters, who had merely declared their intention of becoming American citizens, would not form a class within the meaning of the authorities on the subject. The Constitution saw proper to divide the voters of Texas into two classes; one composed of native-born and naturalized citizens, and the other of foreign-born citizens who have declared an intention to become naturalized. This is a class not by reason of sex, nor color, nor occupation, nor being located in a certain institution, but a class made and determined by the Constitution. The class is just as easy of identification, and is just as clear and distinct as though designated by occupation, nationality, color, sex, or location in a certain place. It is true in the instance of sex and color change to another class is not possible, but as long as the condition of the voter by declaration of intention to become a citizen remains unchanged, his class is just as distinct, although not as visible, as that made by sex or color. The possibility of change to another class does not alter the fact that the Constitution has placed the voter in a certain class as long as he may hold that position. He is as clearly in a class as are persons under 21 years of age, idiots, and lunatics, paupers supported by the county, persons convicted of any felony, or soldiers, marines, and seamen in the service of the army or the navy of the United States, who are the classes debarred from voting. The soldier or the seaman might undoubtedly leave his class and become a citizen, still while in the service of the country he belongs to a certain class that is not permitted to vote. So the foreigner who has declared his intention to become naturalized will remain in that class until he obtains the right to enter the other class of voters.

In the thirteenth paragraph of the petition it was alleged that:

"In several precincts the officers of said election proclaimed publicly to the electors gathered at the polls while the election was being held that no man not born in the United States would be allowed to vote unless he had his final naturalization papers, and that it would be necessary for him to produce them in order to be entitled to vote, and this rule was enforced by the election officers."

It was further alleged that officers made the announcement in precincts 1, 6, and 9, and that it was circulated throughout the precincts, that some voters, naming them, were rejected on the ground mentioned, and that:

"A large number of voters who were not native-born American citizens, but who were qualified to vote by reason of having made a declaration of intention to become citizens of the United States, and who were legally qualified to vote under the Constitution and laws of the state of Texas, were deterred and prevented from going to the polls."

It was further alleged that if the voters had gone to the polls, they would have changed the result of the election. The allegations in this paragraph are reiterated in paragraphs 14 and 15 of the petition. A special exception to all of the paragraphs was sustained by the court, and this action is the subject practically of the first, second, and third assignments of error.

[2, 3] The fifth special exception assailed paragraph 13, on the ground that the names of the officers who made the proclamation at the polls were not alleged, nor in which precincts such officers held the election, and, further, that the paragraph alleged that a large number of voters were prevented from

voting, without giving the names of such voters, their residence and voting boxes. The exceptions were sustained, not only as to paragraph 13, but also as to paragraphs 14 and 15, on the ground that the voters of the class excluded were not named. This, we think, was error.

The petition alleged that announcement was made that a certain class of voters would be excluded from voting; that a number of the class attempted to vote, but were prevented, giving their names; that a number of voters sufficiently large to have changed the result of the election were prevented by the announcement from attending the polls; and that they would have voted against prohibition. These allegations were sufficient to form a basis for proof that a class of voters with a membership sufficient in numbers to have changed the result of the election were deterred and prevented from voting by the unlawful ruling of the precinct officers of election. It was not necessary to name the voters of the class in order to present proof that a number of citizens of a certain class were prevented from voting, not as individuals, but as a class, and that the number was of such magnitude as to have changed the result of the election. When an election is attacked on the ground of exclusion of individual voters, it is necessary that the name of each individual should be given, but the reason for the rule fails as to a class excluded. In that instance no proof as to the individuals is necessary, except as tending to show the number belonging to the excluded class. If the exclusion referred to sex it would be sufficient to allege that members of that sex were excluded, and so as to color, occupation, or a constitutional class. The names are given in case of the exclusion of individual votes in order to identify them and offer an opportunity to the contestee to meet the allegation by testimony. In alleging a class there is as clear an identification of the voters to whom the allegations apply as though each one had been named and otherwise described. When contestee in this case was informed that proof that all foreign voters who had merely declared their intention to become American citizens, but had not received naturalization papers, would be and were excluded from voting, he knew exactly the issue he had to meet, and was put upon as full notice as though each member of the class had been named. In many instances, if not in this, it would be absurd, if not impossible, to give all the names of the class excluded. Take the Iowa case, herein cited, where about 20,000 women were excluded from voting as a class, it would have been preposterous, as well as totally unnecessary, to have pleaded the names of the excluded class. No authority can, we think, be cited that would sustain such a ruling. No good object could be attained by such holding, and no allegation in pleadings is required, which is not supported by some potent reason. Pleading names of individuals excluded from voting in an election contest would not identify voters any more clearly than by alleging a class. The pleadings were sufficiently definite in naming precincts in which the class of voters was excluded and the officers who announced that the class would be excluded.

[4] The twelfth, thirteenth, and fifteenth assignments of error, which are grouped as the fourth assignment, are overruled. The court found that certain voters had removed from the precinct or county where they lived after they had paid their poll tax and voted in the new precinct or county to which they had removed without making the affidavit of payment of the poll tax or had received the certificate of exemption, and that the voter is the identical one named in the poll tax receipt or certificate of exemption and as to his residence for the required time in county and state. All of the voters had paid the necessary poll tax and could have truthfully made the affidavit required by article 2952, Rev. Stats., but no affidavit or oath was required by the officers of election. The affidavit provided for has reference only to the voter who has lost his poll tax receipt, for the law says:

"If a citizen, after receiving his poll tax receipt or certificate of exemption, removes to another county or to another precinct in the same county, he may vote at an election in the precinct of his new residence in such other county or precinct by presenting his poll tax receipt or his certificate of exemption or his written affidavit of its loss to the precinct judges of election, and stating in such affidavit where he paid such poll tax or received such certificate of exemption, and by making oath," etc.

We are of opinion that the affidavit referred to in the law does not apply to any voter except one who has lost his receipt or certificate, because the affidavit is not mentioned except in connection with that class of voters, and it has no reference whatever to a voter with a tax receipt or exemption certificate, and a voter of either of those classes would not be required to present any affidavit whatever to the election officers, but could be required, as would the man who was compelled to present an affidavit of loss, to make—

"oath that he is the identical person described in such poll tax receipt or certificate of exemption, and that he then resides in the precinct where he offers to vote and has resided for the last six months in the district or county in which he offers to vote and twelve months in the state."

Just as the voter with the poll tax receipt or exemption certificate who has moved into another precinct or county is compelled to present such receipt or certificate when he desires to vote, so must the voter who has lost his receipt or certificate present his statutory affidavit of loss before he should be allowed to vote, and in addition as a means of identification each may be required to make oath to certain facts named in the statute.

An "affidavit" is a written or printed declaration of facts confirmed by an oath, while an oath is a pledge, not in writing, made in verification of statements made or to be made. In other words, an affidavit is an oath reduced to writing. The Legislature evidently had in view the distinction between an affidavit and an oath, and contemplated that the fact of loss of receipt or certificate should be in writing, while to establish identity an oath, to be administered by an officer of election, would be sufficient. • As to the voter who has lost his receipt or certificate, the affidavit is essential to qualify him to vote, but the oath is only for the purpose of identification, and if the officers of election are satisfied without it, the vote cast would be legal. Should any of the votes cast have been presented by voters who had lost their receipts or certificates, without affidavits of such loss 'as required by statute, the votes would be illegal, but if the officers failed to require oaths of identification, the votes would be valid if in other respects the voters casting them were qualified. That part of the statute requiring the presentation of the affidavit of loss in lieu of the receipts or certificate is, we hold, mandatory, while that in regard to the oath establishing identity is directory. In the first instance, a vote might be invalidated by a failure to present the affidavit, but the failure to make the oath of identification if the voter is in fact qualified would not affect the validity of his vote.

[5] We cannot accede to the proposition on the part of appellant that by a majority of the qualified voters it was intended to provide that it requires a majority of all the voters of a county or any subdivision thereof to determine the question as to whether intoxicating liquor should be sold therein. As said by McCrary, § 462:

"Where, however, the statute provides in general terms that the election shall be determined by a majority of the electors, it will be held to mean a majority of the electors voting; and, in ascertaining the result under such a statute, no inquiry as to the whole number ·of persons entitled to vote will be necessary or proper."

We think it clear that the Constitution did not contemplate that prohibition might be adopted or continued in force indefinitely by voters remaining away from the polls, but expected local laws to be adopted or defeated by a majority of those voters who prize their ballots sufficiently high to go to the polls and deposit them. This proposition is sustained by a long list of authorities construing similar statutes. The Legislature clearly so construed the constitutional provision to mean a majority of the qualified votes cast, and not a majority of the voters who may reside in the territory to be affected by the election. Article 5723, Rev. Stats. That this is the legislative construction of the Constitution is apparent from article 5723, Rev. Stats., where it is declared:

"If a majority voting at such election vote 'against prohibition,' the court shall make an or-

der declaring the result, and have the same entered of record in the office of the clerk of said court."

Of course if it takes only a majority of the votes cast to defeat prohibition, it would take only a majority of the votes cast to approve it. In the case of Itasca School Dist. v. McElroy, 103 Tex. 64, 123 S. W. 117, the Supreme Court, in passing upon the language of a constitutional amendment relating to schools, held:

"The entire provision satisfies us that that rule has been adopted which ordinarily prevails in elections, and which is that the result as to a question or proposition submitted is determined by the vote given upon it, and not by that upon others."

And we add that the majority vote intended in local option cases is a majority of the qualified voters who cast their ballots, and not by a majority of the voters who may reside in any certain territory.

In the South Dakota case of Williamson v. Aldrich, 21 S. D. 13, 108 N. W. 1063, it is held that, by a "majority of the electors of the city" used in the state Constitution as to incurring a debt, a majority of the electors of the city, and not a majority of those voting, was intended, and yet it is stated in the opinion that the authorities hold that such expressions as "a majority vote of the electors of the county" mean a majority of the votes cast, and not a majority of the votes in the county. Whatever construction courts of other states may place on the language of their Constitutions, we are of opinion that in the case of votes on prohibition a majority of the votes cast was intended. That has been the universal acceptation of the meaning of the terms used in the Constitution since its adoption, and all elections on the subject of prohibition have been determined on that construction. Of course the proposition will not be entertained by this court that illegal votes cast, although not counted for either side of the question, must be added to the total, and if the vote for prohibition was not more than one-half of that total, prohibition was lost. The illegal votes will be eliminated from the count altogether. If the vote of any person could not be counted on either side of that question because of its illegal character, it was not cast by a qualified voter, and ·should be ignored altogether. It would be a singular proceeding to allow illegal votes, which could not be counted for either side, to be used to defeat a proposition by adding them to the total vote and then proclaim that the side having the most legal votes had been defeated because of the illegal votes being counted in the total vote. They would often have more potency in that way than by being cast for their respective sides. Such a procedure would be in the face of article 3062, Rev. Stats., which provides that illegal votes shall be cast out, and in article 5720 it is provided that the officers holding a local

option election shall, in all respects, conform to the general election laws.

[6] The sixth assignment of error is overruled. Robert Linke, being a married man, and his wife and children residing in the town of Beeville in their homestead, and that fact fixing his residence there, although he may have taken only one meal a day at his town home and spent the rest of the time on a farm two miles from town, was a resident of Beeville. If he had the right to vote in Beeville, as claimed by appellants, he was compelled to pay the city poll tax there. He could not be a citizen for the privilege, but not a citizen when it came to the burdens.

The uncontradicted evidence seems to have shown that Joe Bojac paid his poll tax and his vote should not have been excluded.

[7] The eighth assignment of error is sustained. Allowing a voter, who marked his own ballot and voted it without presenting to the officer of election, to prepare and vote another ballot, was inexcusable, and the vote of such voter should have been rejected. A voter should not be allowed to repeat his vote because he had violated the law in casting the first one. If such practice were tolerated, it would require an examination of ballots in order to eliminate one, or both would be counted. In the case of Roach v. Malotte, 23 Tex. Civ. App. 400, 56 S. W. 701, the Court of Civil Appeals of the Second District strongly condemned the action of election officers in allowing a vote deposited by a voter to be taken from the ballot box and another ballot substituted by him. As said by the court, when the voter has voted he cannot change his vote, or vote more than once. How much more reprehensible to permit him to vote again and thus have two ballots in the ballot box. McCormick v. Jester, 53 Tex. Civ. App. 306, 115 S. W. 278.

[8, 9] The voter August Richards was a Frenchman, but moved to Texas and had, up to 1913, been living in Bee county for 15 or 20 years, owning real estate there. In 1913, he sold his home and went to France and remained there until the European war began, when he says "the war got too hot for him," and he returned to Bee county and remained a month and then left for Iowa, where he remained until about Christmas, 1914, when he came back to Bee county, remained a while, voted in the local option election, and then returned to Iowa. The evidence was very unsatisfactory as to the status of the voter, and no effort seems to have been made to ascertain the intention of the voter as to his residence. Residence is determined largely as a question of intention, which may be made to appear by all the facts and circumstances of the case, his declarations, etc. And in this connection it may be said that the presumption that every man has a fixed domicile applies as well to a single as a married man. McCrary, Elections, §§ 102–106. Mere absence from a place of residence alone will not destroy a residence once fixed. The right to vote should not be destroyed on evidence as uncertain as that in regard to Richards.

The tenth assignment of error is overruled. The evidence tended to show that Ed. L. Deloach was a legal voter.

The eleventh assignment of error is overruled. An election would not be set aside on the irregularities named by appellants. Such irregularities should not occur, but an election otherwise properly and honestly conducted should not be destroyed by them.

We sustain the twelfth assignment of error as to witness fees for each voter, the legality of whose vote was attacked. Altgelt v. Callaghan, 144 S. W. 1106. The court should have retaxed the costs as to such voters; and, as the cause will be remanded for another trial, the court will inquire into the status of the voters as to interest, as defined in the cited case, and retax the costs in accordance.

The cross-assignments of error first, second, third, fourth, fifth, sixth, tenth, sixteenth, seventeenth, eighteenth, and nineteenth assail the sufficiency of the evidence to sustain certain findings of fact of the trial judge in regard to the denial of the right of certain voters to cast their votes, and they are overruled. The evidence was reasonably sufficient to sustain the findings. The evidence showed that the voters were excluded because they had merely declared their intention to become citizens and had been naturalized.

The seventh cross-assignment of error has been fully answered in this opinion, and further consideration of the subject is unnecessary.

The judgment of the trial court will be reversed, and the cause remanded, to be tried in compliance with the foregoing opinion.