THE STATE OF DELAWARE, ex rel. PERCY WARREN GREEN, ATTORNEY-GENERAL, v. CHARLES DONNAN HOLZMUELLER.

*(March* 24, 1939.)

LAYTON, C. J., and RICHARDS, J., sitting.

*Tunnell* and *Tunnell* for relator.

*Houston Wilson* for respondent.

Superior Court for Sussex County, June Term, 1938.

18

LAYTON, C. J., delivering the opinion of the Court:

It is admitted by the rejoinder that, at the annual election held in the City of Milford in January 1938, for the purpose of electing a member of Council, forty persons voted in favor of the respondent by means of proxies given by them to him, and that two other persons voted for the respondent under proxies given to others; nor is it denied that, subtracting from the aggregate of votes cast for the respondent the forty-two votes thus cast, the respondent's opponent had a clear majority of the votes cast.

The demurrer to the rejoinder raises the question whether, by the charter of the City of Milford, the City Council was empowered to authorize proxy voting.

At the common law the right of franchise conferred upon a member of a municipal corporation was considered as one in the nature of a personal trust committed to the judgment and discretion of the member as an individual, and was not delegable. 2 *Kent Com.*, § 295; *Walker v. Johnson*, 17 *App. D. C.* 144; *State v. Tudor*, 5 *Day* (*Conn.*) 329, 5 *Am. Dec.* 162; *Taylor v. Griswold*, 14 *N. J. L.* 222, 27 *Am. Dec.* 33. The respondent does not deny the correctness of

this statement. He suggests only that courts have held that a corporation of a *quasi* public nature has the inherent power to authorize by by-law voting by proxy, *State v. Tudor, supra;* and that the doctrine has been applied in non-profit corporations, *People ex rel. Chritzman v. Crossley,* 69 *Ill.* 195, and to religious corporations, *Craig v. First Presbyterian Church,* 88 *Pa.* 42, 32 *Am. Rep.* 417. But, he bases his contention, not at all upon the doctrine of inherent corporate power, but upon the express language of the City Charter.

The last sentence of *Section* 6 (*H*) is, "The Council shall make rules and regulations concerning the voting".

■ It is upon this provision that the respondent relies. He calls attention to the well settled rule of statutory construction, that where the language of a statute is plain and conveys a clear and definite meaning, Courts give to the statute the exact meaning conveyed by the language, adding nothing thereto and taking nothing therefrom, *Van Winkle v. State,* 4 *Boyce* 578, 91 *A.* 385, *Ann. Cas.* 1916 *D,* 104; and he protests that the expression "can only mean a grant of power to the Council of the City to make such rules and regulations concerning the voting at annual municipal elections as it, in its discretion, deems wise and advisable"; and that upon this discretion the Court may not trespass.

■ Generally speaking, the right to vote is not an inherent right. It is a right exercisable under constitutional or statutory authority, and in the mode and manner thereby directed. As a general proposition the Court is inclined to agree with the respondent's statement that the Legislature has the power to delegate the right, and to extend to voters the privilege of voting by proxy, if supplementary to the proposition it is agreed that the power of delegation be granted in express terms. But that the words of the charter, "The Council shall make rules and regulations concerning

the voting", are to be taken as an express grant of authority to the Council to permit proxy voting, or of such authority by necessary implication, is much to be doubted. In *Philips v. Wickham et al.,* 1 *Paige* (*N. Y.*) 590, there is an expression which the respondent takes as lending support to his contention. That was a case involving a drainage company. At an election held to choose commissioners, the inspectors of elections refused to receive votes cast by proxy. It was in these circumstances that the Chancellor said that the right of voting by proxy was not a general right, and that the party who claims it must show a special authority for that purpose. Continuing, he said, "And it is possible that it might be delegated in some cases by the by-laws of a corporation, where express authority was given to make such by-laws, regulating the manner of voting". Obviously, the statement was a dictum, and the language used was not expressive of a proposition considered and determined. It is of slender authority when applied to the case of a municipal corporation. *Capen v. Foster,* 12 *Pick.* (*Mass.*) 485, 23 *Am. Dec.* 632, is cited. In that case an Act was passed requiring voters to register, and this was contested by a qualified voter who had not registered, on the ground that the constitution of the State defined the qualifications of voters. The Court held that, where the constitution has conferred a political right, not designating particularly the manner of its exercise, the Legislature had the power to adopt reasonable and uniform regulations in regard to the time and mode of exercising the right; and in speaking of a statute requiring, at certain elections, voting in writing and in person, the Court said, "As to many of those elections, particularly that of representatives, the constitution is silent upon the question, whether the votes shall be given personally or by proxy, *viva voce* or by ballot. But for this law, all qualified voters might claim the right of voting *viva voce* or by proxy". Here again that statement is dictum. However true the statement may have been having regard

for the circumstances, and the history of the manner of exercising the elective franchise in Massachusetts, it can hardly be said to be of authority in the circumstances presented here.

There are substantial reasons why the provision of the charter of Milford ought not to be expanded so as to empower the City Council to permit voting by proxy at general elections. The language of the provision is not, in its nature, authority conferring; it is mandatory in character. It is not permission giving; it is compulsory. It was clearly intended to impose upon the Council a duty to make provisions for the many details of an election not included in the charter: the place, rules to secure privacy of voting, secrecy of ballot, the presence of persons in or at the voting place, challenge of voters, clerks and assistants, and, generally, such matters and things which the Council should deem advisable whereby to secure a peaceable and orderly election. The Legislature may be supposed to have been entirely familiar with proxy voting. The privilege was conferred in express terms on stockholders of private corporations by the first *General Corporation Law* and it has been preserved in every amendment thereof. No charter of any municipal corporation of this State has been called to our attention which permits voting by proxy at annual or general elections. It would be, of course, unsafe to say that voting by proxy at such elections in this State has not occurred, but it may be confidently said that such occurrence is most unusual. The ease with which, by direct expression, the power could have been conferred, argues strongly that the Legislature did not intend to confer such power upon the City Council.

Reflecting upon these considerations the conclusion is that the City Council had no power to authorize voting by proxy at the election, and the demurrer to the respondent's rejoinder is sustained.

The proposition advanced by the respondent's second

plea is this: the respondent was duly elected as councilman for the second ward of the City at the annual election held on January 19, 1934, for the term of four years and until the election and qualification of a successor; that at the election held on January 24, 1938, no successor was lawfully elected for the reason that the electors of the ward had been given to understand by general rumor, by the rule adopted by the Board of Elections, and by the rule adopted by the City Council, that proxy voting would be permitted; that by reason thereof at least forty electors, a sufficient number to have changed the result of the election or to have rendered it in doubt, were misled or defrauded into casting their votes by proxy; that thereby the election was invalidated, and the respondent is entitled to hold his office under the election held in January, 1934.

 There is little, if any dissent from the proposition that, while irregularity and illegality in the conduct of an election may render it void, yet the election should stand, if the will of the electors can be made to appear from the returns, either alone or aided by extrinsic circumstances, with reasonable clearness and certainty; nor is it doubted that it follows as a necessary corollary that, if it appears that illegal votes have been admitted, it is the first duty of the tribunal trying the contest to purge the poll of such illegal votes if there is evidence upon which this can be done, and give effect to the majority of the good voters. *McCrary, Elections No.* 569; 20 *C. J.* 182; 9 *R. C. L.* 1149; *Woolley v. Louisville S. R. Co.*, 93 *Ky.* 223, 19 *S. W.* 595; *Martin v. McGarr*, 27 *Okl.* 653, 117 *P.* 323, 38 *L. R. A.* (*N. S.*) 1007.

 Courts are always disposed to give effect to elections when possible; and it is only where there is such uncertainty arising from the reception of supposedly illegal votes as to make it impossible to ascertain the true expression of the opinion of the voters, that an election is to be

declared void. As said by Judge Brewster, in *Re Contested Election Cases, Batturs v. Megary*, 1 *Brewst.* (*Pa.*) 162, "impossibility," is "the test."

The respondent does not deny the general principle. His objection to the election is more profound. His contention is that the election was so tainted by irregularity amounting to fraud that it cannot stand at all as an expression of the will of the voters of the ward; and as a result, by virtue of the terms of the election held in 1934, he is entitled to hold his office. He does not boldly charge fraud in the true sense of the term. He chooses to say that the circumstances surrounding the election, that is, the current rumor that proxy voting would be permitted, and the promulgation of the rule allowing voting by proxy by the Election Board and by the Council, resulted in the "hoodwinking of a number of voters of the ward sufficient to have altered the result of the election into throwing away their right to vote thereat".

The authorities cited by the respondent do not lend much support to his contention. In *Miller v. Town of Montclair*, 92 *N. J. L.* 292, 108 *A.* 131, there was an entire failure to carry out the provisions of the *Soldiers' Vote Act* resulting in the disfranchisement of a substantial percentage of voters entitled to cast votes at the election, a number sufficient to change the result. The Court held that the attack was not upon the result, but upon the validity of the election. In *Neelley v. Farr*, 61 *Colo.* 485, 158 *P.* 458, *Ann. Cas.* 1918 *A.* 23, a mining company was enabled to control an election by outrageous fraud, coercion and violence. The Court recognized the distinction between particular illegal votes, provable and computable, which ought to be excluded wherever cast, and the effects of fraudulent combinations and intimidation prevailing generally, and to the extent of rendering the result uncertain, with the consequence that the whole poll must be declared void. *Marsden v. Troy (Tex.*

*Civ. App.*) 189 *S. W.* 960, is a case where voters as a class were prohibited from voting. The Court held that the act of rejecting the body of voters of a certain class contrary to the constitution of the State, would invalidate the election if the number of the class was sufficient to change the result. In *Carn et al. v. Moore,* 74 *Fla.* 77, 76 *So.* 337, it appeared that on the official ballots in a local option election, the words, "For Selling" and "against selling" were printed in a different place on every alternate ballot. The lower Court declared the election void. The judgment was reversed, the Court saying that elections should not be set aside because some official has not complied with the law governing elections where the voter has done all in his power to cast his vote honestly and intelligently, unless fraud has been perpetrated or corruption or coercion practiced to a degree to have affected the result.

Here, actual fraud is not charged. It is not alleged that the Council acted in bad faith. The presumption is that they acted innocently, but with a mistaken view of the law.

The respondent's contention is interesting; in some respects it is startling. He must be supposed to have stated his case in a manner most favorable to himself. There is no allegation that any one of the forty-two voters who cast their votes by proxy would have voted in person except for the general rumor and the rule adopted and published. Mere inference of fact cannot be indulged, nor, on demurrer, are the pleader's conclusions admitted. Moreover, it appears that the respondent, at the time the rule of the Election Board was approved and adopted by the City Council, was a member of that body. It does not appear that he protested against the adoption of the rule. Proxies, generally speaking, are not given without solicitation; and the plea alleges "that each of the respective candidates for the office and their workers were seeking proxies of qualified voters."

It may be assumed that some, at least, of the forty-two voters, who cast their votes by proxy, were solicited so to do by the respondent or his agents. The argument amounts to this: By general rumor proxy voting was to be permitted. The Election Board gave credence to the rumor by the adoption of a resolution permitting voting by proxy. The City Council, of which the respondent was a non-protesting member, adopted and approved the same resolution. The respective candidates for the office in question, of whom the respondent was one, and their agents solicited proxies of qualified voters of the ward; forty-two voters of the ward, a number sufficient to have changed the result of the election or to have rendered the result doubtful, were thereby hoodwinked into voting by proxy for the respondent with the result that their votes were thrown away; therefore the election was void as a true expression of the voters' will, and the respondent holds over by virtue of his election in 1934.

 Hoodwinked is an expressive word. A secondary meaning is to blindfold, and the generally accepted meaning is to deceive as if by blinding, to impose upon, to delude. It appears that the respondent, having succeeded in hoodwinking himself as a member of Council, proceeded to have a hand in hoodwinking others. And the argument is that forty-two voters having been successfully hoodwinked into casting their votes for the respondent by proxy, the election was so tainted with irregularity, or as it is called, constructive fraud, that it cannot stand, and several hundred voters, hoodwink proof, must lose their votes. The argument has novelty, but it is quite unacceptable. Generally speaking, one may not take advantage of his own wrong. It is true that the respondent was not the sole author of the wrong, but he assisted in its perpetration, and received the benefit of it to the extent of forty-two votes, a number sufficient to have changed the result. Whether the

saying, "hoist with his own petard" is expressive of the situation in which the respondent finds himself, it is to be said that it is one from which extrication is impossible.

*Woolley v. Louisville S. R. Co., supra,* is in some respects, an analogous case. There, the Mayor, by circular, announced that no payment of poll tax would be required as a condition for voting, although the law required such payment. It was contended that the election was void, but the Court said that the circular was issued without authority, and that it amounted to no more than the advice of any citizen upon the subject, and quoting *McCrary on Elections, supra,* held that the election was valid.

The conclusion is that the election in question was lawfully held. It is possible, in fact demonstrable from the pleadings, to purge the poll of illegal votes. The demurrer to the second plea is sustained.